(C. D. 1223)

JOHN HEATHCOAT & CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided March 21, 1950)

*John D. Rode* for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*Arthur R. Martoccia*, special attorney), for the defendant.

Before LAWRENCE and FORD, Judges; RAO, J., not participating

FORD, Judge: The protest listed above presents for determination the question of the proper classification of certain imported merchandise which was classified by the collector as silk netting not made on a bobbinet machine, and duty was levied thereon at the rate of 90 per centum ad valorem under paragraph 1529 (a) of the Tariff Act of 1930. Various claims are made in the protest but the claim relied upon is that the merchandise is properly dutiable at only 60 per centum ad valorem under said paragraph 1529 (a), as modified by the trade agreement with the United Kingdom, T. D. 49753, as nets or nettings made on the bobbinet machine, not embroidered, wholly or in chief value of silk.

At the trial of this case, upon motion of counsel for the plaintiff, there was admitted in evidence and marked collective exhibit 1 the direct and cross-interrogatories and answers thereto, together with the attached exhibits and samples, of the production and technical director of the exporter herein. This witness, after describing briefly the operation of a bobbinet machine, was asked the following question:

What changes or alterations if any were made on the bobbinet machine in producing the nets covered by the above mentioned shipment? Please attach photographs if possible to illustrate these changes.

In response to the above question the witness replied as follows:

There are three alterations made to a bobbinet machine in producing malines. They are (1) the traverse of the carriages is stopped by disconnecting the shogging mechanism of the comb bar; (2) the movement of the guide bars which control the position of the warp threads in relation to the carriage threads is altered; (3) the number of points is doubled. (Witness here entered as evidence Exhibit A). Exhibit A shows the end view of two bobbinet machines. That on the right making bobbinet; that on the left making maline. It shows the omission of the rack chain that controls the movement of the comb bars. The two central rack chains controlling the movement of the guide bars are altered to a different pitch. This is not noticeable on the Exhibit. (Witness here entered as evidence Exhibit B). Exhibit B illustrates the type of rack chain which is used to operate the mechanism of the comb bar and the guide bars. (Witness here entered as evidence Exhibit C). Exhibit C illustrates a maline on the facing bar of the machine. It also illustrates the points.

The witness further stated that such alterations did not change the drive or speed of the machine; that they did not increase the normal

work load or constitute any additional difficulty for the twisthand; that the same type of warp and carriage is used; that the take-up of the net is unaltered; that the alterations to the bobbinet machine are of a temporary nature, taking about 2 hours to make them; that such changes do not affect the basic nature of the bobbinet machine; that such alterations change only the motion of the mechanism; that no new or additional parts or attachments are used; and that as altered the machine is still known as a bobbinet machine.

In answer to cross-interrogatories the witness stated that the circular motion of the bobbin is not an essential characteristic of the machine; that it is only essential to produce plain bobbinet; that he considered the essential characteristic of the bobbinet machine to be the fact that it will produce imitation hand-made net or netting on a commercial scale; that if the circular motion of the bobbin is stopped it prevents the machine from producing the normal type of bobbinet, but it does not prevent the machine from making alternative types of net, all of which are recognized as being the product of a bobbinet machine; that the main characteristic of the bobbinet machine is its ability to make complete meshes of net using warp and carriage threads; that after the mesh has been formed the movement of the points together with the take-up of the machine completes the required mesh; and that when a bobbinet machine is altered so as to prevent the circular motion of the bobbins, the rack chain controlling the movement of the comb bar is removed from the machine.

Counsel for the defendant offered the testimony of two witnesses who stated in effect that when a bobbinet machine is altered, as hereinbefore outlined, it is no longer known as a bobbinet machine for the reason that such a machine will not then produce bobbinet, although agreeing that such altered machine would produce other forms of net of the same character as made on other net machines; that "When you stop the shogging of the comb bar, you are making a warp net, not a bobbinet." "When the shogging is stopped, it makes a warp net." One witness also stated it would take 2 or 3 days to make the alterations in the machine, hereinbefore set out, and that he would consider such an alteration a major alteration. One witness admitted that a bobbinet machine, unaltered, produced net, and that a bobbinet machine, as altered in this case, also produces net. It was also testified that in altering a bobbinet machine as was done in this case "You take cams off and put different ones on," which is directly contrary to the testimony of the witness who actually supervised the alteration of the machine that made the nets here involved.

One of defendant's witnesses stated that net could be produced on a bobbinet machine; that he had heard of "such a net as maline net being produced on a bobbinet machine," and that "This probably was," apparently referring to the sample of imported merchandise

in evidence. The witness also stated that such an alteration as was made in the machine which produced the nets here in question might be either a change of motion or a fundamental mechanical change, or both, "I don't know, but I think it is a simple thing to do." Both witnesses, however, maintained that once the shogging action of a bobbinet machine was stopped, the machine was no longer known as a bobbinet machine. The record further discloses that a bobbinet machine weighs several tons.

Counsel for the defendant, in his brief filed herein, contends that:

When a bobbinet machine is so altered that the shogging of the comb bar is stopped with the result that the bobbins do not traverse the carriages of the machine, the machine then loses its identity as a bobbinet machine because a bobbinet machine was primarily constructed and designed to manufacture bobbinet.

Counsel for the plaintiff, on the other hand, contends in effect that disconnecting the shogging mechanism of the comb bar, with the result that the bobbins do not traverse the carriages, does not cause the machine to lose its identity as a bobbinet machine.

The language of paragraph 1529 (a) of the Tariff Act of 1930, under which the merchandise was classified, is as follows:

Par. 1529. (a) * * * and all fabrics and articles made on a lace or net machine, all the foregoing, plain or figured; * * * 90 per centum ad valorem.

Said paragraph 1529 (a), as modified by the trade agreement with the United Kingdom, T. D. 49753, under which the importer claims, provides as follows:

Nets and nettings made on the bobbinet machine, not embroidered: * * * Wholly or in chief value of silk, 60% ad val.

The nets or nettings here involved were not classified as being embroidered; they are not claimed by either party to be embroidered, and the record before us shows that they are not embroidered. The real issue to be decided is whether or not these nets or nettings were made on a bobbinet machine. In answering that question, we must determine whether or not the alterations, hereinbefore set out, made upon the original bobbinet machine caused it to lose its identity as a bobbinet machine. If such alterations or changes caused the machine to lose its identity as a bobbinet machine, then the classification made by the collector would appear to be correct; otherwise, the plaintiff is entitled to judgment in its favor.

It is clear from the language employed in the trade agreement, *supra*, that it was not the intention of the negotiators thereof to limit the reduction in duty to bobbinets alone. The language of the trade agreement covers and includes any and all nets or nettings which are made on the bobbinet machine. This shows quite definitely that the said trade negotiators recognized the fact that not all nets made on a bob-

binet machine were bobbinets, but that nets other than bobbinets were also made on bobbinet machines.

The above observation finds confirmation in the following excerpts taken from Report No. 83, second series, issued by the United States Tariff Commission, entitled LACES AND LACE ARTICLES (page 205):

### BOBBINET

#### I. DESCRIPTION AND USES

Bobbinet is a plain (unfigured) lace with hexagonal meshes made by inter-twisting threads. It is an exact machine-made imitation of the net made by hand on the lace pillow with bobbins—hence the name bobbinet. The products of the bobbinet machine are called bobbinet in the United States, plain net in England, and tulle in France, the fine qualities in France being called "tulle uni" and the coarse qualities "tulle grec." Other names are wash-blonde, mosquito net, Mechlin, Cambrai, Bretonne, Brussels, and silk illusion; coarse yarn cotton nets, heavily starched, are in England called rice-nets.

*Certain variations from regular bobbinet have been made on the bobbinet machine:* [Italics ours.]

1. Square-mesh net was made on the bobbinet machine in England in 1921.

2. An imitation of Grecian net is made by the extension of the length of the hole to eight motions. Bobbin threads change positions at the first, third, fifth, and seventh motions; they cross each other at the first and fifth, but at the third and seventh motions single threads only cross the wale.

3. A variation called "striped net" has been developed by the introduction of gimps, worked from independent beams threaded in steel bars, the movements of which are controlled by cams or Dawson wheels. The possibility of movement is limited, and the pattern consists of stripes of varying width divided from each other by bands of plain net.

4. Diamond-shaped objects have been formed on the mesh by the omission of certain bobbins at definite distances on the machine. As the two sets of bobbin threads traverse the net diagonally in opposite directions the desired result is obtained.

5. Diamond-shaped objects of a color different from the groundwork of the net were created by carrying colored threads in the bobbins at definite distances.

In addition to these variations made on the bobbinet machine, two other products have been made by mechanical adaptations of the machine. Having invented the bobbinet machine in 1809, Heathcoat experimented with adapta-tions. In 1813 he perfected an adaptation for the production of quillings. Quill-ings, known in the United States as "footings", are narrow insertions of plain net of cotton, silk, or rayon, ranging from 1 to 5 inches in width. They are made on the bobbinet machine as a result of Heathcoat's 1813 adaptation causing the traversing bobbin threads to turn again at intervals when the desired width of the net is attained. A lacing thread put in while the work is going on keeps the adjoining breadths united; these threads are drawn when the piece is dressed.

In the case of *Durbrow & Hearne Manufacturing Co.* v. *United States,* 9 Ct. Cust. Appls. 148, T. D. 37993, our appellate court had before it the question of the proper classification of a certain machine known as an 8–8 machine, which the collector had classified as an embroidery machine, and which was claimed by the importer to be

a sewing machine, based upon the contention that a sewing machine does not become an embroidering machine merely because of its adaptability to embroidering, citing as authority for such contention *O. J. Ahlstrom et al.* v. *United States*, T. D. 34607 (G. A. 7582). In the *Ahlstrom* case, *supra*, this court said:

Whether a sewing machine is an embroidery machine, or vice versa, must be determined by a knowledge of the character of the construction of its mechanism and of the primary purpose for which it was designed. It is a matter of common knowledge that a great number, if not all, of the various types of ordinary sewing machines, by the manipulation or adjustment of one or more of their attachments, may be rendered competent to perform fancy stitching or embroidered work. * * *

\* \* \* \* \* \* \*

While it is true that each of the machines here under discussion bears a striking similarity in use to a sewing machine, in that both classes of machines employ needles and thread and are capable of sewing fabrics, nevertheless the proof here submitted clearly establishes the fact that these particular machines were primarily constructed and intended to do all kinds of festooning and embroidery work, and that they were advertised and sold by protestants as and under the name of embroidery machines.

As already stated, all machines operating needle and thread are species of sewing machines, just as embroidery machines, as defined by Knight, are forms of sewing machines, but the latter may be distinguished from the former class by reason of its construction and the primary design of its manufacturer as to its principal function or use.

Commenting upon the above quotation, our appellate court, in the *Durbrow* case, *supra*, said:

We have quoted thus at length from the opinion of the board because in our view the language is well chosen to express the true rule of distinction between embroidering and sewing machines.

A machine that is primarily constructed and designed for sewing fabrics is still a sewing machine although used for the purpose of embroidery work, and, on the other hand, a machine primarily constructed and designed to do embroidering remains such, even assuming, although we do not understand that it is so, that it might be used for ordinary machine sewing. The question is not so much what it does as what it primarily was constructed and designed to do.

Again in *Durbrow & Hearne et al.* v. *United States*, 11 Ct. Cust. Appls. 446, T. D. 39440, in considering a question very similar to the one involved in the former *Durbrow* case, our appellate court observed:

In the Durbrow & Hearne case, *supra*, we held that a machine which was "primarily constructed and designed for sewing fabrics is still a sewing machine, although used for the purpose of embroidery work, and, on the other hand, a machine primarily constructed and designed to do embroidering remains such, even assuming, although we do not understand that it is so, it might be used for ordinary machine sewing. The question is not so much what it does as what it is primarily constructed and designed to do."

\* \* \* \* \* \* \*

We do not think the question of chief use is a safe criterion for determining within which class a particular machine may fall, but that it is more likely to carry out the intent of Congress to reaffirm the doctrine of Durbrow & Hearne Co. case, *supra,* that the primary construction and design of the machine (in the absence of a commercial designation) must control.

We think the evidence here clearly establishes that the primary construction and design of these machines are for sewing and not for embroidering. The fact that the universal feed, which is an attachment to the machine, enables it to sew in any direction without moving the fabric by the hand of the operator is not such a departure from the general design of a sewing machine to place it as a matter of law in the class of embroidery machines, nor does the difference in speed necessarily lead to that conclusion.

The Government does not contend that this machine was designed, constructed, or adapted for embroidery only, and there is no question that there are such machines.

Following the principles announced in the authorities hereinabove set out, we must hold that a machine that is primarily constructed and designed for producing or making bobbinet is a bobbinet machine, even though used for the purpose of producing or making plain malines or maline nets or nettings. The question is not so much what such a machine does as what it primarily was constructed and designed to do. We think the evidence before us clearly establishes that the primary construction and design of the machine upon which were produced, or which made, the involved nets or nettings, were for making bobbinet and not for making malines or maline nets or nettings. The fact that certain alterations have been made in said bobbinet machine, which enable it to make or produce plain nets or nettings, would not appear to be such a departure from the general design of a bobbinet machine as to place it, as a matter of law, outside the category of a bobbinet machine. The defendant herein does not contend that this machine was designed, constructed, and adapted for making plain nets or nettings only, and the record clearly establishes that there are such machines.

After a full consideration of the record before us, in the light of the authorities hereinbefore cited, the conclusion that the machine upon which the involved nets were made was a bobbinet machine appears to be inescapable.

We therefore hold that the silk nettings covered by this protest which were assessed with duty at 90 per centum ad valorem under paragraph 1529 (a) of the Tariff Act of 1930 are properly dutiable at only 60 per centum ad valorem under said paragraph 1529 (a), as modified by the trade agreement with the United Kingdom, T. D. 49753, as alleged by the plaintiff.

To the extent indicated the specified claim in this protest is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.