And now, to wit, this 26th day of November, 1968, for the reasons set forth in the foregoing Memorandum Opinion, it is ordered, adjudged and decreed:

1. That the Virgin Islands Board of Control of Alcoholic Beverages and Cyril E. King, Government Secretary of the Virgin Islands, be and they are hereby restrained from further proceeding with the confiscation of 877 cartons of alcoholic beverages, the subject matter of this action.

2. That the Secretary release the said 877 cartons of alcoholic beverages to the petitioner herein for sale in accordance with its license, under the following conditions: (a) The Secretary, if and when necessary, cause individual items of the various categories to be tested for both proof and content, and (b) thereafter direct the petitioner to affix proper labels to the remaining items in a particular category, or (c) in his discretion, supervise through his representative the placing of such labels, all expenses of which testing and/or labeling to be borne by the petitioner.

3. That judgment be entered in favor of the petitioner and against the respondents as set forth in Paragraphs 1 and 2 above, each side to bear its own costs.

**GIDDINGS & LEWIS MACHINE TOOL CO. et al.**

v.

**UNITED STATES.**

C.D. 3612; Protest Nos. 66/8178–19635.

United States Customs Court,
Second Division.

Nov. 12, 1968.

Covington & Burling, Washington, D. C. (James V. Siena,[1] John B. Denniston, and Donald Hiss, Washington, D. C., of counsel), for the plaintiffs.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Arthur H. Steinberg, New York City, trial attorney), for the defendant.

Before RAO, Chief Judge, and FORD, Judge.

FORD, Judge:

The merchandise involved in these cases, consolidated at the trial, consists of three models of machines bearing the trade name "Endomatic", produced by Giddings & Lewis-Fraser, Ltd. of Arbroath, Scotland. They were entered at the ports of Boston and New York in December 1963 and on various dates in 1964 and 1965, and were assessed with duty at 15 per centum ad valorem under item 674.35, Tariff Schedules of the United States, as "Metal-working machine tools: Other". It is claimed that they should have been classified at 12 per centum ad valorem under item 674.32 as "Metal-working machine tools: Boring, drilling, and milling machines, including vertical turret lathes", or at 10 per centum ad valorem under item 678.50, as machines not specially provided for.

The pertinent provisions of the said tariff schedules are as follows:

Machine tools:
    Metal-working machine tools:

| | | |
|---|---|---|
| 674.30 | Machine tools for cutting or hobbing gears | 20 % ad val. |
| 674.32 | Boring, drilling, and milling machines, including vertical turret lathes | 12% ad val. |
| 674.35 | Other | 15% ad val. |
| 678.50 | Machines not specially provided for, and parts therof | 10% ad val. |

The record consists of the testimony of three witnesses and 24 exhibits introduced in evidence by plaintiffs and the testimony of one witness and 8 exhibits introduced in evidence by the defendant.

Plaintiffs' first witness was William M. Ritter, manager of international sales at Giddings & Lewis Machine Tool Company, which is a 50 percent owner of Giddings & Lewis-Fraser, Ltd. Giddings & Lewis imports a broad line of machine tools and Mr. Ritter is responsible for the sale of such machine tools, works with potential customers, and supervises field

1. Withdrew as attorney June 1, 1967.

installations and service. In the course of his duties he has become familiar with the design and operation of the Endomatics, with the uses for which customers intended them, and also with the characteristics and design of other manufacturers' machine tools which compete with the Endomatics.

Plaintiffs' second witness was Dr. John G. Bollinger, professor of mechanical engineering at the University of Wisconsin. He holds a Ph. D. in the field of mechanical engineering and his professional specialty has been in the area of machine tool design. He has published papers on various aspects of this subject and has served as a consultant in this area for a number of American firms. He has had practical shop experience and has done research in the design factors pertinent to the economical operation of machine tools. He had reviewed the sales literature and maintenance and operating instructions for the Endomatics, had discussed the design and characteristics of the Endomatics with Mr. Ritter and with Mr. Walter McCann, vice president for engineering at Giddings & Lewis Machine Tool Company, and had personally examined a Model MC Endomatic.

Plaintiffs' third witness was Robert W. Gunn, assistant sales manager of Rudel Machinery Company, Inc., an independent distributor of machine tools, representing about 25 machine tool manufacturers in the United States and Europe. Mr. Gunn is responsible for the sales of all the basic types of machines handled by Rudel, including boring, drilling, and milling machines. He has become familiar with the capabilities of such machines, has attended numerous training sessions organized by machine tool manufacturers, and has been provided with the engineering specifications and drawings necessary to ascertain the capabilities and limitations of the Endomatics. His firm actively participates in the sale of Endomatics; he has sold one model and has promoted the others.

Defendant's witness was Walter W. Gibbons, who has been in the machine tool business since 1903 and is presently associated with the Morey Machinery Company, manufacturers and dealers in new and used machine tools. His knowledge of the Endomatics was derived from the testimony of plaintiffs' witnesses and the exhibits introduced at the trial.

The merchandise before the court consists of three models of the Endomatics, designated as MC, SC, and HDB. They are advertised in sales promotion literature (exhibits 1, 2, 3, and 4) as versatile tool rotating machines by means of which both ends of a workpiece can be machined simultaneously. The functions of the MC are described in exhibit 1 as follows:

> * * * Two heads, one on each transverse slide, mill or saw the component to precise length. Centring, facing, chamfering, drilling or turning operations are then performed by the other two heads.

Exhibit 2 states as to the SC:

GREAT OPERATIONAL VERSATILITY * * *

> spotfacing, centring, drilling, chamfering and turning * * * all these operations either in combination or individually

Exhibit 2 describes the HDB, as follows:

> A heavy duty boring machine with slide feed heads. Can be supplied with outfeeding units for relief and taper boring, etc.

Mr. Ritter testified that all Endomatics are made on a building block principle whereby common components are used in more than one model. The basic units can be assembled to suit a variety of purposes. All the models have a large rectangular base to which the various heads and holding devices are attached. Each head is driven by its own motor. The machines are 3 feet wide, about 5 feet high, and range in length from

around 6 feet up to a maximum of about 18 feet. They are similar in shape to a lathe.

The work is done by the machine by means of various cutting tools which are inserted into adapters, which are in turn inserted into the rotating member of the machine. The tools are advanced into or across the work, which remains fixed. Among the tools used are standard twist drills, center drills, block-type boring tools, combination spot facing and center drilling tools, block type cutters used for facing, combination center drilling and chamfering tools, hollow mills, reamers, step drills used for counterboring operations, shell end mills, slot milling cutters or straddle milling cutters, and slitting saws. According to the testimony these are all basically forms of boring, milling, or drilling tools and can be used with machines other than the Endomatics. The Endomatics do not use anything other than these basic tools.

The SC and MC models prepare parts for subsequent operations on other machines, such as lathes or grinders, whereever a workpiece might be held between two centers. A center, according to the witness, is a conical shaped piece of metal on a lathe or other machine tool on which a workpiece can rotate. A center drill is used to put a tapered hole into the end of a workpiece so that it can be held between the centers of another machine tool.

Dr. Bollinger testified that a metal working machine tool is a machine designed to shape or form or surface work a metal workpiece. He divided metal working techniques into metal cutting, metal disintegrating, and metal forging techniques. He subdivided metal cutting techniques into six categories: Milling, drilling, boring, planing, grinding, and turning. He made the distinctions on the basis of the geometry of the tools, the orientation of the tools and the workpiece, and the design of the machinery that performs these functions.

He said there are machines recognized by the trade as designed and constructed primarily for drilling, or for boring, or for milling. He described drilling as the process of originating a hole in a workpiece with an end cutting tool. He defined boring as the enlarging or finishing of a hole and milling as the removal of material from a workpiece with a rotating cutter.

Mr. Ritter testified that "centering" is a short cut for "center drilling", which is a form of drilling and that spot facing is the finishing of material around a hole by the removal of metal to provide a bearing surface for some other device. The purpose of chamfering, he said, is to remove the sharp edges that have been drilled, bored, or had some other machining operations. Turning is the removal of material from the outside diameter of a part. Reaming is the enlarging of a hole produced by another method to a specific size. Counterboring is the drilling of a larger diameter hole at the top of a small diameter hole. In England, this operation is referred to as "recessing".

The witness indicated these operations are normally done in conjunction with milling, drilling, or boring. He also pointed out that the Endomatics were not capable of turning the entire length of a workpiece, but only a short length.

Mr. Ritter testified that the SC is primarily a spot facing and centering machine; that its main purpose is the drilling of holes and that the spot facing is done at the completion of the drilling operation. It is also capable of chamfering and light boring and has modest uses for turning and reaming.

This witness stated that in his experience, based on his knowledge of the terminology of the trade, the SC was a drilling machine. He made this classification on the basis of the design of the machine, the speed and feed ranges available, the construction of the spindle, and

its capabilities of handling the tool. Both Mr. Ritter and Dr. Bollinger stated that the SC does not perform any machining functions which cannot be performed on other drilling machines, and that there are other drilling machines which perform the functions of which the Endomatic is capable. According to Mr. Ritter the main difference between the Endomatic and other drilling machines is the fact that there are two heads and work can be done on both ends simultaneously. That feature serves particular industrial needs in the preparation of shafts that require matching on both ends prior to other operations on lathes, grinders, and similar equipment.

Mr. Ritter testified that the SC is offered and sold to the trade as a spot facing and centering machine and that it is known in the trade as a spot facing centering machine. In promoting sales, it is represented to the trade that the SC is capable of performing functions other than drilling in order to justify the purchase of the machine by the average machine shop.

Dr. Bollinger testified that he would classify the SC as a special purpose drilling machine, even though it can perform other functions. He explained:

> The SC is essentially a double-headed drilling machine. They are designed for drilling certain—also for—excuse me, a certain amount of boring and these heads are placed opposing each other along the same center axis. I would use the word special in the sense that there is a limited degree of freedom in the workpiece and tool. I am talking about the head.

> \*   \*   \*   \*   \*'   \*

Q. What, with respect to design of the spindle in the Model SC in your judgment places it in the drilling machine category?—A. I have seen it in the literature used D–2 quill feed spindle. It has the speed and feeds which would be customarily associated with the drill sizes that are commonly used. It has the power and so forth that would be commensurate with this kind of machine.

Mr. Gunn testified that there is a significant market for a machine that does center drilling, as in the majority of cases shafts must be centered or set drilled prior to subsequent operations. He said that the SC also does spot facing, counterboring, boring, light hollow milling or turning, and chamfering, but he promoted it only for center drilling and spot facing. He understood from the brochures that it was basically a drilling machine and would do the other operations as auxiliary functions, adding to its versatility. He said that the trade accepted it as a center drilling machine and that it fell into the basic category of drilling machines on the basis of the design of the machine, that is, it had a quill type of feed, and a rotating type spindle, and was built to take center drills in the spindle.

According to Mr. Gunn, drilling machines can be built in different sizes and will perform various functions depending upon the type of tooling.

Mr. Ritter testified that the HDB is primarily a boring machine, used mainly to bore the end of tubing. It is also capable of drilling, facing, chamfering, turning, and reaming operations. With the use of special attachments, it is capable of woodruff key seating and tag slot milling. He said that the HDB has a boring type of spindle permitting it to bore with a great degree of accuracy and speed. The various capabilities of the machine are pointed out to the customer to justify the purchase.

Both Mr. Ritter and Dr. Bollinger testified that the HDB is not capable of performing any function which cannot be performed on other boring machines and that other boring machines are capable of performing the functions of the HDB. The HDB differs in that it is a double-end machine which can work on

two ends of a part simultaneously. That feature serves a particular industrial need in the manufacture of conveyor rolls, printing press rolls, and things of that sort.

Dr. Bollinger testified that the HDB is a special purpose boring machine because of the provision for feeding a boring bar with boring tools, the appropriateness of the horsepower for performing the boring cut, the design of the slide-way feed and the general characteristics of the spindle.

Mr. Gunn testified that the HDB is promoted primarily for boring but is capable of other functions in conjunction therewith. In his opinion it fell into the category of boring machines.

Mr. Ritter testified that the milling head of the MC is capable of performing only milling or sawing operations and that its drilling head is primarily used for drilling, although it is also possible to spot face, ream, chamfer, and do light boring and turning operations. In his opinion it is basically a drilling and milling machine, even though it performs other functions. These features are pointed out as additional benefits to the customer.

Both Mr. Ritter and Dr. Bollinger stated that the MC could not perform any function which could not be performed on other milling machines. It is distinguished from other milling and drilling machines by the fact that it is a 4-headed machine and is double-ended. This feature serves a need primarily in the preparation of castings, forgings, and round steel materials for subsequent operations on other machines.

Dr. Bollinger said that the MC is a special purpose milling and drilling machine with a boring capacity. He testified:

> From the milling point of view, first of all there is a pair of opposing milling heads with heavy duty spindles. It has a cross-slide feed, that is, trans-verse to the workpiece and I would attach the special purpose to it in this case because one is restricted to a particular kind of cut on this milling machine, on the Endomatic. * * *

* * * * * *

The drilling head is attached to an adjacent milling head and again, the special purpose aspect is that the machine is designed to orient in relation to drilling orient the workpiece and drill head in a particular prescribed relationship. That is, the coincidence of the axis of the drills.

Mr. Gunn testified that he sells the MC for milling and centering and that the additional functions are auxiliary operations performed normally in conjunction with milling. He never promoted it solely on the basis of its ability to do the other functions. In his understanding it falls within the category of milling and centering or drilling machines, and the trade would so regard it.

Mr. Gibbons identified various types of drilling, milling, and boring machines sold by his company and depicted in its 1953 machine tool catalog (exhibit G). He said that these types had been on the market for many years and that their operations had not changed although more frills and higher speeds have been added. In his opinion the Endomatics are "special package" or "assembled" machines or "machines that are built up with various units". He testified:

> I would say that they are all packaged machines made up of units. There are several manufacturers making the same thing. They have to be mounted on a bed or a table and have to be provided with a table to hold the work for a vise or fixture to hold the work, but they are combination package machines. * * *

He said that none of them would be sold by his company as milling, drilling, or boring machines and that they were not any type of standard milling, drilling,

or boring machines recognized by the trade. The trade would consider them special package milling, drilling, and boring machines. He explained that basic machine tools like boring, drilling, and milling machines are designed in one way, while a combination machine is not a fixed type of machine. He said that the classification, drilling machine, covers a type that has a long feed, whereas the Endomatics have a very limited feed motion; that they are combination production machines which will do drilling, but are not drilling machines. He stated that if someone came into his office for a milling, drilling, and boring machine, the Endomatics would not be given a thought. In his opinion, the Endomatics were constructed to do particular jobs and were a limited type of machine for some specific production.

There is no question but that the Endomatics are machine tools. The principal issue here is whether they are boring, drilling, and milling machines within the meaning of item 674.32, supra. In this connection we note that Dr. Bollinger listed metal cutting tools as milling, drilling, boring, planing, grinding, and turning tools, and that Mr. Gunn described the basic kinds of machine tools as turning, boring, drilling, milling, shaping, planing, metal forming, and gear hobbing. See also The Harper Encyclopedia of Science, volume 3, pages 689–690; Summary of Tariff Information, 1929, pages 812–814; Summaries of Tariff Information, 1948, schedule 3, part 4, page 112. No one has claimed that the Endomatics do planing or grinding, and their capacity for turning is limited. They do mill, drill, or bore. The HDB is described in the literature (exhibits 1, 2, and 3) as a heavy duty boring machine, and plaintiffs' witnesses called it a boring machine or a special purpose boring machine. The SC was described as a spot facing and centering (center drilling) machine or as a special purpose drilling machine, and the MC as a milling and drilling machine or a special purpose milling and drilling machine.

The opinion of plaintiffs' witnesses that the Endomatics here involved were boring, drilling, or milling machines was based on the design and construction of the machines, their capabilities, and the principal purposes for which they were actually used. They were promoted for boring and milling, and a kind of drilling, center drilling, and their ability to do other related auxiliary operations was pointed out to potential customers to justify their purchase by the average machine shop. The Endomatics do not perform any operations which other boring, milling, and drilling machines could not perform. While their use is limited to workpieces of certain sizes and shapes and the machines have a limited feed motion and other limitations, they operate on both ends of a workpiece simultaneously. Consequently, Dr. Bollinger designated them as special purpose drilling, boring, or milling and drilling machines. While defendant's witness, Mr. Gibbons, stated that these Endomatics were not any type of standard milling, drilling, or boring machine, he called them special package milling, drilling, or boring machines.

Defendant has placed great emphasis on the literature offering the Endomatics, which emphasizes their various capabilities, and on certain other catalogs and brochures.

Exhibit A is a general catalog published by Giddings & Lewis Machine Tool Company, in which, the Endomatics are listed under the general heading "Manual Pushbutton Machines" and the specific heading "Centering and facing machines". Three inch, 4 inch, and 5 inch horizontals, planer mills, planers, radial drilling machines, and upright drilling machines are also listed under this general heading. Other horizontals, boring, drilling, and milling machines are listed under "N/C Section", described as "industry's most complete line of numerically controlled heavy-duty precision machine tools." These generally appear to be large machines.

Exhibit B depicts a large machine described as a new 5 inch horizontal. Mr. Ritter said it was one type of milling, drilling, and boring machine offered by Giddings & Lewis. He stated that the difference between the Endomatics and horizontal boring, drilling, and milling machines is in the structure of the machines, not their purpose. They perform the same operations on different sizes and shapes of work. Exhibit C depicts the Sundstrand drilling and centering machine, which Mr. Gunn said was similar to the MC Endomatic. Exhibit D depicts the Sundstrand "CentrMil", which is designed for milling and centering in a single-end or double-end model. In the Sundstrand machine tool catalog (exhibit E), milling and centering, and drilling and centering, machines are listed under centering machines. Exhibit F depicts the Seneca Falls automatic drilling and centering machine which Mr. Gunn said was competitive with the SC Endomatic.

According to this evidence, there are many types of boring, drilling, and milling machines in various sizes, shapes, and designs, the difference being in the structure and not the purpose of the machines. The issue here comes down to whether a special purpose machine that primarily does boring (or drilling, or milling and drilling), which is limited to workpieces of certain sizes or shapes and by the feed motion, and freedom in the workpiece and tool, but which performs on both ends of a workpiece, and is capable of other operations in conjunction with boring (or drilling, or milling and drilling) falls within the tariff provision for boring, milling, and drilling machines.

The words used in the tariff schedules are "Boring, drilling, and milling machines, including vertical turret lathes". The terms are not qualified by the word "standard" or any other limitation, except to the extent that the specific inclusion of vertical turret lathes excludes other lathes. Therefore, the provision must be construed as including all forms of boring, drilling, and milling machines. Nootka Packing Co. et al. v. United States, 22 CCPA 464, 470, T.D.

47464; United States v. Goffigon, 43 CCPA 172, 175, C.A.D. 625; C. F. Liebert v. United States, 60 Cust.Ct. 677, C.D. 3499. In the case last cited we held that the term "clutches" in item 680.54 of the Tariff Schedules of the United States was not limited to standard type clutches or any particular type of clutch, but included all forms of clutches.

In the July 1, 1962 edition of United States Import Duties Annotated there is included the statistical reporting numbers and commodity descriptions to be used by importers, pursuant to Schedule A, Statistical Classification of Merchandise Imported into the United States. Listed under the tariff classification, "Boring, drilling, and milling machines, including vertical turret lathes" (p. 161), are:

Boring machines and boring and milling machines, except jig-boring (include vertical turret lathes)

Drilling machines

Milling machines (specify by type, such as: vertical, horizontal, plane and universal)

Under the tariff classification "Other" are listed:

Grinding machines

Jig-boring machine tools

Lathes (specify by type, such as: bench; light duty; heavy duty engines; turret, except vertical turret; automatic chucking; and automatic screw (bar) machines)

Other metalcutting type machine tools (specify by name, such as: broaching machines; planers, except planer-type milling machines; shapers; honing and lapping machines; polishing and buffing machines)

This is an indication that the provision for "Boring, drilling, and milling machines", first specifically made by the trade agreement with the European Economic Community, 97 Treas.Dec. 157, 267, 297, T.D. 55615, was intended to include many different specific machines, primarily for boring, drilling, and milling. It also shows that lathes (other

than vertical turret lathes) and automatic screw machines, were not considered to fall within that classification, even though, according to the record herein, they do perform boring, drilling, and milling operations. In view of the testimony here that those are not their primary functions, it would appear that the tariff classification for "Boring, drilling, and milling machines" was intended for such machines as are primarily concerned with those operations.

The Harper Encyclopedia of Science notes (vol. 3, p. 689):

Machines specially designed to produce identical parts in quantities (mass production) are termed production machine tools. Examples are automatic lathes, turret lathes, screw machines, gear-cutting machines, threading machines, multiple-spindle drill presses, broaches, and punch presses.

In the Summaries of Tariff Information, 1948 (vol. 3, part 4, p. 112), in a description of machine tools, it is stated:

General purpose machines are power-driven machines for forming or shaping. They are adaptable to all kinds of work within their general functions and capacity. The working of such machines is controlled to a large extent by a skilled operator. Typical examples of this kind of machines are the engine lathe, which revolves the work while a cutter is held against it; the planer, which moves the work back and forth under a planing tool; the drilling machine for drilling holes; the milling machine, in which the work is shaped by the action of revolving toothed cutters; and the grinding machine, in which abrasive wheels are used to remove metal.

Machine tools of both these groups vary greatly in size and in the number and type of operations they perform. Some are relatively simple devices while others are among the most complicated equipment used in industry.
\* \* \*

Nothing in the evidence in this case indicates that the Endomatics belong to the class of production machine tools or special machines designed to produce one article only. They are adaptable to all kinds of work within their general functions and capacity and do not mass produce any one thing.

The following definitions of boring, drilling, and milling machines indicate that they are classed by the functions they perform:

The McGraw-Hill Encyclopedia of Science & Technology:

Boring. A machining operation that increases the size of an existing hole in a workpiece. The usual purpose of boring is to machine a hole to a desired diameter while obtaining required accuracy and finish. In metal working, boring is performed after making a circular hole in the piece by some method such as coring, drilling, burning, punching or trepanning. [Vol. 2, p. 294.]

Drilling machine. A motor-driven device fitted with an end cutting tool that is rotated with sufficient power either to create a hole or to enlarge an existing hole in solid material. One or more flutes or grooves in the drill tool conduct coolant to the cutting lips and also provide chip relief.

Twist drills with two spiral flutes are commonly used to originate holes, while 3- and 4-flute non-center-cutting drills are used to enlarge holes. Other types are center, core, hog-nose, and gunbarreled drills. Cylindrical saws or pin drills are used in trepanning to cut large circular holes.
\* \* \* \* \* \*

Drilling speeds usually decrease with material hardness while feed per revolution increases with drill diameter. Spotfacing to finish the area around a hole, counterboring to enlarge the diameter over part of the depth, and countersinking to chamfer edges of a hole are operations frequently performed during drilling set-ups. [Vol. 4, pp. 273–274.]

Milling machine. A machine for the removal of metal by feeding a work-

piece through the periphery of a rotating circular cutter. The multi-toothed cutter of a milling machine produces a milled surface as each revolving tooth removes a portion of metal from the passing workpiece. [Vol. 8, p. 441.]

Webster's New International Dictionary (1954 edition):

boring tool. *Machine Shop Practice.* An internal-turning tool, having usually a single cutting point, used to enlarge a hole, finish it to size, and ensure its being true with a specified center line. * * *

drilling machine. A machine for drilling, reaming, counterboring, and tapping holes; esp., a power machine for drilling holes in metal, as a drill press or radial drill.

milling machine. *Mach.* a A machine tool upon which the milling process is performed. * * *

Funk & Wagnalls, New Standard Dictionary (1958 edition):

milling machine, *n. Mech.* * * * 2. A machine for removing metal by rotating cutters. * * *

drilling machine, *n.* A machine for boring or drilling.

boring machine, *n.* Any machine for boring, especially one of large size as distinguished from a drill; a machine for dressing a hole, as the inside of a cannon, as distinguished from one that simply drills a hole.

The Endomatics here in issue do perform the operations of boring, drilling, and milling as described in these definitions. Defendant claims, however, that they must be denied classification as such because they are highly versatile machines which do more than boring, drilling, and milling. It is clear that they do perform other functions and the promotional literature emphasizes their versatility. However, according to the witnesses, they were sold on the basis of their ability to center drill, bore, and/or mill. The additional operations were auxiliary. They also can be performed by other boring, drilling, and milling machines.

Under previous tariff acts, machines have been classified on the basis of their primary design, construction, and function, even though they could perform other auxiliary or incidental operations. O. J. Ahlstrom et al. v. United States, 26 Treas.Dec. 1121, T.D. 34607; Durbrow & Hearne Manufacturing Co. v. United States, 9 Ct.Cust.Appls. 148, T.D. 37993; Durbrow & Hearne et al. v. United States, 11 Ct.Cust.Appls. 446, TD. 39440; John Heathcoat & Co., Inc. v. United States, 24 Cust.Ct. 145, C.D. 1223; H. W. Brintnall Co. v. United States, 4 Cust. Ct. 73, C.D. 289.

In Durbrow & Hearne Manufacturing Co. v. United States, supra, the court stated (pp. 151–152):

A machine that is primarily constructed and designed for sewing fabrics is still a sewing machine although used for the purpose of embroidery work, and, on the other hand, a machine primarily constructed and designed to do embroidering remains such, even assuming, although we do not understand that it is so, that it might be used for ordinary machine sewing. The question is not so much what it does as what it primarily was constructed and designed to do.

In John Heathcoat & Co., Inc. v. United States, supra, in a case involving the question of whether the machine upon which certain merchandise was made was a bobbinet machine, the court stated (p. 151):

* * * The fact that certain alterations have been made in said bobbinet machine, which enable it to make or produce plain nets or nettings, would not appear to be such a departure from the general design of a bobbinet machine as to place it, as a matter of law, outside the category of a bobbinet machine. * * *

See also Clutsom Machines, Inc. v. United States, 21 Cust.Ct. 30, C.D.

1122, where the court stated that classification should be determined largely by a consideration of the design, character, and purpose of the machine.

The weight of the evidence in the instant case establishes that the primary design, construction, function, and use of the Endomatics here involved are for boring, drilling, and/or milling, and that their additional functions are merely auxiliary.

 On the basis of the entire record and the authorities cited herein and in the briefs presented by the parties, we hold that the Endomatics before the court are forms or types of boring, drilling, and milling machines and are properly classifiable under item 674.32 of the Tariff Schedules of the United States at 12 per centum ad valorem, under the provision for boring, drilling, and milling machines, including vertical turret lathes. The protests are sustained and judgment will be entered for the plaintiffs.