(C.D. 4013)

SCHICK X-RAY CO., INC. *v.* UNITED STATES

## United States Customs Court, First Division

(Decided May 5, 1970)

*Allerton deC. Tompkins* for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Bernard J. Babb* and *Robert Blanc*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This protest involves the proper duty rate on articles invoiced as automatic high-pressure injectors that were imported from Sweden via the port of New York in 1964. They were classified by the government under item 709.13 [1] of the Tariff Schedules of the United States as syringes, and assessed duty of 42.5 percent ad valorem.

Plaintiff claims, in the alternative, that the articles are properly dutiable under one of the following items:

| Item [2] | Classification | Rate |
|---|---|---|
| 660.90 | Pumps for liquids_____ | 12% ad. val. |
| 688.40 | Electrical articles, nspf_____ | 11.5% ad val. |
| 709.17 | Other electro-medical apparatus and parts thereof. | 12% ad val. |
| 709.27 | Other medical instruments and apparatus and parts thereof. | 36% ad val. |

---

[1] Tariff Schedules of the United States, Schedule 7, Part 2, Subpart B:
Medical, dental, surgical and veterinary instruments and apparatus (including electro-medical apparatus and ophthalmic instruments), and parts thereof:

| | | |
|---|---|---|
| * * * * * * * | | |
| 709.13 | Syringes, including hypodermic syringes, and parts thereof (except needles) _____ | 42.5% ad val. |

[2] The statutory provisions for the item numbers listed are:

| | | |
|---|---|---|
| 660.90 | Pumps for liquids, whether or not fitted with measuring devices; * * * all the foregoing whether operated by hand or by any kind of power unit, and parts thereof_____ | 12% ad val. |
| 688.40 | Electrical articles, and electrical parts of articles, not specially provided for_____ | 11.5% ad val. |
| | Medical, dental, surgical and veterinary instruments and apparatus (including electro-medical apparatus and ophthalmic instruments), and parts thereof: | |
| | * * * * * * * | |
| | Electro-medical apparatus, and parts thereof: | |
| | * * * * * * * | |
| 709.17 | Other _____ | 12% ad val. |
| | * * * * * * * | |
| | Other: | |
| | * * * * * * * | |
| 709.27 | Other _____ | 36% ad val. |

The primary issue is whether the imported apparatus is a syringe within the meaning of item 709.13.[3] As to this, plaintiff's position is that the apparatus performs more functions than a simple syringe and was, therefore, incorrectly classified under item 709.13. Defendant argues that the only function of the apparatus is to inject fluid into the body and that it therefore, by use, comes within the common meaning of the term "syringe."

The facts are these: The importation consists of electromechanical apparatus and parts used in the diagnosis of cardiac and cardiovascular diseases. The function of the apparatus is to inject a concentrated dye medium, which is X-ray opaque, into the bloodstream so that shadows of the heart and blood vessels can be reproduced on X-ray film. X-rays ordinarily penetrate the blood vessels and the heart without leaving a shadow. Hence it is necessary to use an X-ray opaque dye medium to produce sufficient contrast to photograph these body functions. Further, in order to obtain quality X-rays, the dye medium must be sent through the body at a high rate of speed, otherwise, the normal circulation of the blood would dilute the dye solution so quickly that the dye concentration would not remain sufficiently strong to produce a clear picture.

The imported apparatus contains the following essential parts: (i) a temperature control system (which keeps the contrast medium at body temperature); (ii) a forced water system (operated by an electric pump); (iii) a hydraulic pump (for supplying air pressure as a driving force); (iv) facilities for coordinating the action of the imported apparatus with X-ray equipment (so that the X-rays will not be taken until the dye medium reaches the desired point in the circulatory system); and (v) a remote control system (in order that the X-ray technician not be exposed to harmful X-rays).

The apparatus functions in the following manner: A needle is attached to a length of plastic tubing,[4] which in turn is attached to the injector by a so-called Luerlock fitting on the apparatus. The needle is inserted into the patient's blood vessel and the dye medium, heated to the desired temperature, is injected into the bloodstream at a predetermined rate of speed which is controlled by the pressure mechanism. At the moment the dye medium reaches the specific area, an X-ray filming device is activated and the X-rays of the heart or other portion of the circulatory system are taken.

---

[3] The record in *Schick X-Ray Co., Inc.* v. *United States,* 49 Cust. Ct. 38, C.D. 2358 (1962), was incorporated into the record of the present case without objection. In that case, which arose under the Tariff Act of 1930, the court held that apparatus identical to that involved here was properly classifiable under paragraph 353 as electrical therapeutic apparatus, as claimed, rather than under paragraph 359 as surgical instruments, as classified. Thus, the issue in the prior case was entirely different than the issue here.

[4] Neither the needle nor the tubing is imported with the merchandise in question.

The sole function of the apparatus is to inject a contrast fluid into the body under controlled conditions for the purpose of taking X-rays. The X-rays are used for diagnostic purposes to enable the physician to study and determine the exact location of cardiac and vascular defects.

With these facts as a background, the question is whether the imported apparatus is encompassed within the common meaning of the *eo nomine* provision for syringes in the tariff schedules, or whether the apparatus is more than a syringe.

Various dictionaries define the term "syringe," as follows:

*Webster's New International Dictionary* (1963):

syringe 1: a device used to inject fluids into or withdraw them from the body or its cavities: as a: a device consisting of a nozzle of varying length and compressible rubber bulb and used for injection or irrigation (ear ∼) (vaginal ∼) b: an instrument that consists of a glass barrel fitted with a plunger and a hollow needle and is used for the injection of medicines or for aspiration of fluid from body cavities (hypodermic ∼) c: a device that operates by gravity, consists of a reservoir of rubber, glass, or enamelware fitted with a long rubber tube ending with an exchangeable nozzle, and is used for irrigation of the vagina or bowel—called also *fountain syringe.* * * *

*Webster's New International Dictionary* (1948 ed.):

* * * A kind of small hand pump for throwing a stream of liquid or for purposes of aspiration. It consists of a cylindrical barrel and piston, or a bulb of soft but elastic material, with a nozzle. It is used for injecting liquids into animal bodies, for cleansing wounds, etc. b. Hence, a device for a similar purpose, as a rubber bag connected with a nozzle by a long tube (called in full *fountain syringe*).

*Stedman's Medical Dictionary* (1961 ed.):

syringe [G. *syrinx*, a tube]. An instrument used for injecting fluids.

Anel's s., a s. with a very fine nozzle for use in injection into the nassal duct.

chip s., a tube through which air from a rubber bulb or from a pressure tank is forced to blow debris out of a cavity.

Davidson s., a rubber tube, armed with an appropriate nozzle, intersected with a compressible bulb, with valves so arranged that compression forces the fluid, into which one end of the tube is inserted, forward to the nozzle end.

fountain s., an apparatus consisting of a reservoir for holding fluid, to the bottom of which is attached a tube armed with a suitable nozzle; used for vaginal or rectal injections, irrigating wounds, etc., the force of the flow being regulated by the height of the reservoir above the point of discharge.

hypodermic s., a small s., armed with a hollow needle in place of a nozzle, for use in giving remedies by the subcutaneous method.

Luer s., a glass s. with airtight glass piston, for hypodermic and intravenous use.

rubber-bulb s., a s. with a hollow rubber bulb in place of a cylinder and piston. The cannula is usually of metal and provided with a check valve. Used to obtain a jet of air or water.

*Dorland's Medical Dictionary* (1957 ed.) :

syringe (sir'inj) [L. *syrinxe;* Gr. *syrinx*]. An instrument for injecting liquids into any vessel or cavity. Anel's s., a delicate syringe for the treatment of the lacrimal passages. chip s., a small, fine-nozzled syringe for blowing away the cuttings while excavating a tooth cavity. Davidson's s., one which is operated by the alternate compression and expansion of a soft bulb of India rubber. dental s., a small syringe with a curved tip for use in dental work. fountain s., an apparatus which injects a liquid by the action of gravity. Higginson's s., a form of rectal enema syringe. hypodermic s., one by means of which liquids are injected through a hollow needle into the subcutaneous tissues. Luer's s., Luer-Lok s., a glass syringe for intravenous and hypodemic use. Neisser's s., a urethral syringe for use in gonorrhea. Pravaz's s., a hypodermic needle fitted to a long, slender cannula and trocar. probe s., a syringe whose point may be used also as a probe: used mostly in treating the lacrimal passages. pyorrhea s., a syringe having a fine nozzle for reaching pyorrhea pockets. tooth s., a dental syringe.

*Blakiston's New Gould Medical Dictionary*, 1956 :

Syringe—An apparatus of metal, glass, or plastic material, consisting of a nozzle, a barrel, and a plunger or a rubber bulb, used to inject a liquid into a cavity or under the skin.

It is apparent from these dictionary definitions that "syringes" take many forms and operate in many different ways; e.g., by: (1) cylinder and piston (hypodermic) ; (2) rubber bulb; (3) reservoir, tubing and nozzle (fountain) ; and (4) a tube and pressure tank in the case of the chip syringe. Thus, "syringes" are not limited to the small hand-pump types described in the 1948 edition of *Webster's*, as plaintiff contends.

Further, the dictionary definitions make clear that the function of a syringe is to inject a fluid into the body. And this, the record shows, is the function of the imported apparatus. However, plaintiff points out that the imported apparatus, in addition to injecting fluids into the body, also (1) controls the conditions under which the fluid is injected (i.e., with regard to the temperature and speed of flow of the dye medium) ; (2) has facilities for correlating the movement of the dye medium with the picture-taking device of an X-ray apparatus; and (3) can be operated by automatic remote control facilities. Because of

these additional functions, plaintiff argues that the imported apparatus is not within the common meaning of the term "syringe" but is something more than a syringe and thus does not fall within the *eo nomine* provisions therefor. We cannot agree since these additional functions are ancillary to the main function of the article—i.e., injecting dye into the bloodstream.

Under the tariff acts, articles are classifiable on the basis of their primary design, construction and function, even though they are capable of performing other auxiliary or incidental operations. *Giddings & Lewis Machine Tool Co. et al.* v. *United States*, 61 Cust. Ct. 284, 296–97, C.D. 3612, 292 F. Supp. 394 (1968), and cases cited. On this aspect, the comments of Ake Gidlund, the inventor of the imported apparatus, are worth considering. In a paper entitled *Development of Apparatus and Methods for Roentgen Studies in Hoemodynamics*, Stockholm, 1956, which was published in *Acta Radiologica Supp. 130*, pp. 22–23, Gidlund explained the demands or requirements which caused him to design the imported apparatus, and then stated (p. 23) :

> The author has tried to meet these demands by constructing high-pressure and motor-driven *injection syringes* * * *.
>
> In constructing a high-pressure *injector syringe* for contrast injection into the heart and vessels the demands listed above are met in the following manner : [5] [Emphasis added.]

Relevant is *Astra Trading Corp.* v. *United States*, 56 Cust. Ct. 555, C.D. 2703 (1966), where the court held that a screwdriver, with a flashlight component, was not classifiable as something more than a screwdriver but came within the *eo nomine* provision for screwdrivers. "We do not believe [the court stated] that the additional feature of illumination transforms the basic purpose of the imported article from use as a screwdriver into some other use; nor do we believe that the illuminating feature gives the article a use in addition to its intended use as a screwdriver. For, illumination notwithstanding, the article remains essentially a device restricted to the use of turning screws, i.e., a screwdriver." 56 Cust. Ct. at 561. By the same token, the apparatus involved here, notwithstanding its additional auxiliary features, remains essentially a syringe.

Also relevant is *United-Carr Fastener Corp.* v. *United States, et al.*, 56 Cust. Ct. 347, C.D. 2648 (1966), *aff'd*, 54 CCPA 89, C.A.D. 913 (1967). There certain metal articles known as "TEE NUTS" were classified as "nuts" under paragraph 330 of the Tariff Act of 1930. The

---

[5] Throughout the entire paper, Gidlund refers to his apparatus as a "syringe" or "injector syringe," and the trade literature, too, from 1953 to 1963, referred to the apparatus as a high-pressure syringe. Subsequently, the trade literature referred to the apparatus as an "injector" rather than a "syringe" but there is no qualified testimony in the record showing the reason for the change.

"TEE NUTS" were designed to replace the conventional nut, bolt and washers and perform the same function but in a new and more efficient way. The issue was whether the "TEE NUTS" were included within the *eo nomine* provisions for "nuts" in paragraph 330 or whether they were something more than "nuts" and thus classifiable under the basket provisions of paragraph 397 for manufactured articles. The court found the "TEE NUTS" to be classifiable as "nuts" under the *eo nomine* provision therefor, notwithstanding the existance of the additional features and capabilities of the new article in question. In so holding the court pointed out that the "TEE NUT" was an evolutionary advance of the "nut" rather than a new article of commerce, and that while it did more things than its forerunners, it was still the same article which, in its function, solved some of the problems and obstacles of past experiences.

Here, similarly, the imported apparatus does more than its forerunners and was designed to solve certain problems or demands of the particular function it serves. But its primary function is still the same as any other syringe—to inject fluid into the body. Thus, we conclude that the apparatus is not a new article of commerce but rather a more complex and improved syringe than its predecessors. And since it is basic that an *eo nomine* provision includes all forms of the article,[6] we hold that the imported apparatus is a "syringe" within the common meaning of that term.

The protest is overruled. Judgment will be entered accordingly.

(C.D. 4014)

---

[6] E.g., *Nootka Packing Co. et al.* v. *United* States, 22 CCPA 464, 470, T.D. 47464 (1935).