(C.D. 2648)

UNITED-CARR FASTENER CORPORATION *v.* UNITED STATES (NORTHERN SCREW CORP., PARTY IN INTEREST)

United States Customs Court, Second Division

(Decided April 6, 1966)

*Brooks & Brooks* (*Thomas J. McKenna* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Richard J. Kaplan* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.
Party in interest not represented by counsel.
*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) as *amicus curiae*.

Before RAO, FORD, and RICHARDSON, Judges

RICHARDSON, Judge: This American manufacturer's protest involves the proper dutiable classification of merchandise described on the invoice as "THE NUTS" and which was imported at New York from Italy. The merchandise in question was classified in liquidation as steel nuts under 19 U.S.C.A., section 1001, paragraph 330 (paragraph 330, Tariff Act of 1930), as modified by T.D. 51802, and assessed for duty at the rate of 0.3 cent per pound. It is claimed in the protest that the subject merchandise is properly classifiable under 19 U.S.C.A.,

section 1001, paragraph 397 (paragraph 397, Tariff Act of 1930), as modified by T.D. 54108, as manufactured articles of steel, not plated with platinum, gold, or silver or colored with gold lacquer, and assessable thereunder at the rate of 19 per centum ad valorem.

No question is here raised concerning, and the record fully establishes compliance with, procedural requirements antecedent to the filing of the instant manufacturer's protest under 19 U.S.C.A., section 1516 (section 516, Tariff Act of 1930, as amended). And although the evidence before the court concerns itself with the fabrication and uses of domestic merchandise of the plaintiff's creation, the parties have conceded that the fabrication and uses of the imported product are the same as those of its domestic counterpart.

The evidence discloses that the so-called "TEE NUT" is stamped or shaped into the circular form resembling a "T" from cold-rolled steel strip. The hollow stem portion of the "T," termed a barrel, is tapped internally with a female thread for the purpose of enabling the barrel to receive and retain the male thread of a bolt. And from and around the edges of the crossmember of the "T," called a flange, three or four prongs are sheared out and turned or bent at right angles to the flange in a direction parallel to the barrel. When the article is viewed from above and over the crossmember, the pronged flange gives the appearance of being an outer circle and the tapped barrel the inner circle. When manufacture is completed, the so-called "TEE NUT" comprises in all of its parts an article of hardware composed of a single piece of steel. The article is made in various sizes and thread specifications to suit particular applications. In use, the "TEE NUT" is inserted barrel first up to the tip of the prongs into a hole previously drilled into a wood object to accommodate the barrel. The flange is then driven into the wood to the depth of the prongs so that the flange is flush with the surface of the wood. (Not all so-called "TEE NUTS" are made for wood applications. One type, depicted in defendant's exhibit M and designated a weld and rivet "T" nut, is used in metal applications.) In this position the "TEE NUT" is secured to the wood, is immovable, and provides the link in the joining together of two pieces of wood.

A now common exponent of the aforesaid method of joining pieces of wood together is shown in plaintiff's illustrative exhibit 17. The exhibit consists basically of two parts of wood—one piece representative of a table and the other representative of a supporting leg of the table—and two articles of hardware, namely, a bolt and a "TEE NUT." The bolt is mounted in and secured to the broad end of the tapered circular leg, and the "TEE NUT" is secured to the block of wood in the manner hereinbefore described. The leg, thus armed, may be screwed

into the block of wood through the "Tee Nut" which remains stationary and secured to the block of wood to which it is attached. In this manner, the leg is joined to the table. And by a reverse screw action, the leg may be disassembled from the table. At no time during either the assembly or disassembly of the pieces of wood does it become necessary to touch or manipulate the "Tee Nut" with hand or tool.

John A. Searle, Jr., a graduate engineer and plaintiff's manager of engineering and new products developments, testified that the prongs of the "Tee Nut" serve two functions—they "retain the nut from being pushed out of the wood as the screw enters the open end," and "keep the nut from rotating as the screw is tightened to it." And with respect to the function of the flange, the witness stated, "It performs the same function as a washer, distributing the load over a larger area." He said that the function of the flange is separate and distinct from that of the nut itself. Mr. Searle also testified that the "Tee Nut" is used for blind applications where the conventional nut and bolt could not properly be used. And he is sure that the "Tee Nut" has replaced the use of other kinds of fasteners.

Wilmer H. Churchill, vice president and chief engineer of plaintiff's New England division, testified, among other things, that he was probably responsible for forming specifications and tooling methods for the first "Tee Nuts," that the primary function of the flange is to distribute the load and that its secondary function is to provide a base for the fashioning of the prongs, that the flange performs the load-bearing function of a washer, but not the *spacer* and *joint* functions of a washer, that the "Tee Nut" was designed with the long barrel to get sufficient threads for strength, that from his own knowledge and experience the article was originally designed for the automotive industry with a view toward retention of the nut to a component before application to an assembly of some kind, as for example, to an automobile seat or floorboard prior to attachment to the automobile, and with respect to wood applications, that the "Tee Nut" eliminated the necessity for counterboring in wood for a square or hexagon nut.

As to nomenclature of the subject merchandise, Mr. Searle stated that he had always assumed the generic word for the description of the product from the shape of the finished nut. Maurice Ostrover, a salesman for Keystone Bolt and Nut Corp., testified that he has always sold this merchandise in the United States as "Tee Nuts," that he has never known them as anything else but as "Tee Nuts," and that the majority of his purchasers refer to them as "Tee Nuts," although some of them refer to the article as prong nuts or barrel nuts.

Eric M. Cohn, president of Northern Trading Co., Inc., successor to Northern Screw Corp., the party in interest herein, and also president

of Keystone Nut and Bolt Corp., testified that he had been importing the "Tee Nut" depicted in exhibit 1 since 1957, that he has always known the merchandise in the language of the trade and commerce in the United States as a "Tee Nut," that it has never been referred to as anything else, and that when a distributor orders "Tee Nuts" from him, the distributor refers to them as "Tee Nuts," giving the size and barrel dimensions.

The issue in this case is whether the imported merchandise is a "nut" within the meaning of the *eo nomine* provision for nuts in paragraph 330, or whether it is something more than a nut, a combination article as plaintiff contends, and classifiable as such under paragraph 397. The competing tariff provisions, as modified, read as follows:

[Par. 330.] Nuts, nut blanks, and washers, of wrought
iron or steel_____ $\frac{3}{10}$¢ per lb.
[Par. 397.] Articles or wares not specially provided for,
whether partly or wholly manufactured:

     *       *       *       *       *       *       *

Composed wholly or in chief value of iron, steel, copper,
brass, nickel, pewter, zinc, aluminum, or other base
metal (except lead), but not plated with platinum,
gold, or silver, or colored with gold lacquer:

     *       *       *       *       *       *       *

   Other, composed wholly or in chief value of iron,
     steel, brass, bronze, zinc, or aluminum_____ 19% ad val.

No question of commercial designation of the subject merchandise is presented in the record before the court, in consequence of which, the word "Nuts" as used in paragraph 330 must be given its ordinary meaning. And in connection with the common meaning attaching to the word "Nuts," a number of definitions of the term have been offered for our consideration by the parties. Webster's New International Dictionary of the English Language, unabridged (1929), defines a "nut" as:

   * * * 8. A perforated block (usually a small piece of metal), with an internal, or female, screw thread, used on a bolt, or screw, for tightening or holding something, or for transmitting motion.

In Funk & Wagnalls New Standard Dictionary of the English Language, the word "nut" is defined as:

   * * * *n.* 2. mech. One of various small parts, generally movable. (1) A block of metal having a hole in which a screw-thread has been cut, so that it may be fitted upon a bolt, screw or the like, and usually square or six-sided for convenience for turning with a wrench: . . . .

Webster's New International Dictionary, second edition, unabridged (1956), defines the word "nut" as:

> * * * 4.   A perforated block (usually a small piece of metal of square or hexagonal section), with an internal, or female, screw thread, used on a bolt, or screw, for tightening or holding something, or for transmitting motion.

And in Knight's American Mechanical Dictionary, volume 2, page 1537, we find the following definition of the word "nut":

> * * * 1.   (Machinery).   A  piece  of  metal . . . tapped  and adapted to be screwed on the end of a butt. . . .

That the subject merchandise possesses some features common to these definitions admits of little doubt.   The "TEE NUT" has an internal screw thread, is used for holding something together, and is fabricated from a piece of metal.   However, it is plaintiff's contention that the shape characteristics of the "TEE NUT," i.e., the flange and prongs, suit the article to perform other tasks in addition to that to which the barrel of the article is adapted to perform, with the result that the "TEE NUT" becomes or is something more than a nut, and as such, is beyond the ambit of the paragraph.   Shape characteristics are stressed in some, but not in all of the above definitions.

In support of its contention, plaintiff has called our attention to a number of cases purporting to be authority for the proposition that an imported article combining the features of two or more articles is to be deemed for tariff classification purposes an article apart from the several articles it combines—a separate entity.   These cases are *Garrard Sales Corp.* v. *United States*, 35 CCPA 39, C.A.D. 369 (combination radio and phonograph), *Hirsch & Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 82, T.D. 33365 (steel strips plated with nickel), *Kaufman & Vinson Co.* v. *United States*, 44 Cust. Ct. 238, C.D. 2180 (combination map measuring and compass instrument), *The Kroder Reubel Co., Inc., et al.* v. *United States*, 42 Cust. Ct. 149, C.D. 2079 (combination iron and brass tubes), *B. R. Anderson & Co.* v. *United States*, 30 Cust. Ct. 420, Abstract 57258 (fish cutting and can filling machine), *A. Tanzi Engineering Co. et al.* v. *United States*, 30 Cust. Ct. 4, C.D. 1490 (dough rolling and cutting machine), *M. W. Zack Metal Company* v. *United States*, 26 Cust. Ct. 91, C.D. 1306 (zinc slabs containing other metallic elements), *Clutsom Machines, Inc.* v. *United States*, 21 Cust. Ct. 30, C.D. 1122 (textile weaving and knitting machine), *Baker Ice Machine Co., Inc.* v. *United States*, 4 Cust. Ct. 22, C.D. 274 (steel pipe with aluminum fins), and *Krueger & Hoch* v. *United States*, 2 Cust. Ct. 68, C.D. 88 (combination nail and screw).

After studying the cases relied upon by plaintiff, and after viewing the exhibits of the article in question, which are themselves potent witnesses, we are of the opinion that classification of the merchandise at bar is not controlled by the holdings in these cases. The merchandise of the cited cases appears to fall into one or other of two categories, namely, (1) articles of a composition of different materials, and (2) articles having dual or multiple end uses. The cases falling into the first category have no relevancy here for the reason that composition of materials is not an issue in this case. The evidence before us indicates that the "Tee Nut" is fashioned from a single piece of steel which is not alloyed with other metals, thus satisfying that portion of paragraph 330 relating to composition of the articles covered by the paragraph. With respect to end uses, the subject of concern of cases in the second category, "the question is not so much what * * * [the imported article] does as what it primarily was constructed and designed to do," insofar as classification of the article is concerned. *Clutsom Machines, Inc.* v. *United States, supra,* page 35, citing *Durbrow & Hearne Manufacturing Co.* v. *United States,* 9 Ct. Cust. Appls. 148, T.D. 37993, and *Durbrow & Hearne et al.* v. *United States,* 11 Ct. Cust. Appls. 446, T.D. 39440. In cases falling into the second category, the courts undoubtedly found the particular articles there involved to be primarily constructed and designed to do two or more things. We note, however, that in the *Garrard* case, our appeals court expressly limited its decision to the facts of that case largely, we think, because the radio and phonograph components were not separate entities in one cabinet since they shared common amplifier and loudspeaker facilities.

In the instant case, the testimony indicates that the "Tee Nut" came into vogue as a labor and timesaving device in joining objects together, replacing an older, obsolete method of doing the same thing. What appeared to be uppermost in the minds of users of nuts and bolts, according to evidence of record, was the development of a faster, more efficient method of joining components together by means of nuts and bolts, the solution to which problem was apparently found in the evolution of the "Tee Nut." In other words, users of the article were not concerned with the design and creation of a new article of commerce, unrelated to problems and obstacles of past experiences. Hence, shape characteristics of the evolved "Tee Nut" are expressly by design related to such experiences in industries using nuts and bolts as a means of joining component parts together. Single-mindedness of purpose as a holding device was preserved through evolution of the "Tee Nut" as a replacement article. The fact that a function, previously performed by a washer, which at best is but auxiliary when associated in use with a nut, was eliminated in

this evolutionary process, contributed to the improvement of, rather than a change in identity of the article as a nut, in our opinion. And the further fact that the evolved "Tee Nut" took on the added character of immobility does not, in our opinion, militate against the article continuing to be a species of nut. According to some of the above noted definitions, shape (square or hexagonal) of a nut is a condition facilitating the manipulation of the article. And this condition of maneuverability was simply improved upon in the evolution of the "Tee Nut."

Support for this view of the nature of the subject merchandise is to be found in *United States* v. *National Carloading Corp. et al.*, 48 CCPA 70, C.A.D. 767 (steel pry bars as crowbars), *United States* v. *Motor Car Equipment Co.*, 3 Ct. Cust. Appls. 77, T.D. 32355 (lock washers or nut locks as washers), *H. T. Kennedy Co., Inc., et al.* v. *United States*, 32 Cust. Ct. 124, C.D. 1593 (steel U-shaped railroad spikes as spikes), and *C. S. Emery & Co.* v. *United States*, 64 Treas. Dec. 1135, T.D. 26313 (railroad screw spikes as spikes) which were cited, among other cases, in the briefs of defendant and *amicus curiae*. In these cases, the shape characteristics of the imported article suited it to perform functions over and above that performed by the article as to which *eo nomine* tariff classification was sought. The courts found that the articles should be given their claimed *eo nomine* classification notwithstanding the existence of additional features and capabilities in the articles in question. The same approach to classification of the "Tee Nut" in the instant case should be made as was made in the aforementioned cases. For the reasons stated, we hold that the involved "Tee Nut" is a species of nut within the ambit of paragraph 330, and that the collector's classification of the "Tee Nut" as a nut under that paragraph was correct. The protest is, therefore, overruled.

Judgment will be entered accordingly.