(C.D. 4215)

J. E. BERNARD & CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 10, 1971)

*Schwartz & Lidstrom* (*Joseph Schwartz* and *Barnes, Richardson and Colburn* of counsel) for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Steven R. Sosnov* and *Steven P. Florshiem,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case involves the proper tariff status of "autoload firm cartridges" that were imported from West Germany through

_____

[3] Section 36(h) of the Tariff Schedules Technical Amendments Act of 1965, Public Law 89-241. 79 Stat. 933.

the port of Chicago in 1968. They were classified by the government under item 722.50 of the tariff schedules as parts of projectors and assessed duty of 31 percent. Alternatively, the government claims that the imports are properly classifiable under item 722.55 as parts of photographic film viewers, dutiable at 40 percent.

Plaintiff claims that the imported articles are properly classifiable under item 722.80 which covers photographic film reels and reel cans and provides a rate of duty of 17 percent. Alternatively, plaintiff claims classification under item 774.60 as other articles, not specially provided for, of plastics, with duty at the rate of 15 percent.

The relevant statutory provisions are as follows:

Classified under:

Projectors, and combination camera-projectors, with or without sound reproducing, or sound recording and reproducing, systems:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

722.50    Parts of any of the foregoing projectors or camera-projectors _____    31% ad val.

Government's alternative claim:

Photographic film viewers, titlers, splicers, and editors, all the foregoing and combinations thereof, and parts of such articles and combinations:
    Articles containing an optical lens or designed to contain such a lens, and parts thereof:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

722.55      Other _____    40% ad val.

Claimed under:
722.80      Photographic film reels and reel cans_____    17% ad val.

Plaintiff's alternative claim:

Articles not specially provided for, of rubber or plastics:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

774.60      Other _____    15% ad val.

We turn first to the facts, as established at trial. The imported autoload cartridge [1] consists of a plastic container having a film aperture plate and two cores inside in which a spool of microfilm can be stored or used in a microfilm reader. A microfilm reader, it is to be noted, is

---

[1] The name "autoload' is a trade name owned by the Bell & Howell company—the consignee of the present importations—and is used to identify various Bell & Howell products.

a device that enables one to read material that is photographically recorded on microfilm.

The imported autoload cartridge is used as follows: Microfilm is exposed by a camera (or microfilm recorder as it is called in the industry) and the desired pictures are taken. The film is then processed and wound on a reel (of metal or plastic) or on the imported autoload cartridge where it is stored until it is needed to find a specific bit of information; the reel or cartridge containing the information is then placed on the microfilm reader. After the information is found, the reel or cartridge is then taken off the reader and placed back in storage.

The importation performs the basic function as a conventional film reel except that—unlike a reel—it does not have to be rewound. In this connection, a conventional reel—holding a certain length of microfilm—requires the use of an additional empty reel (the take-up reel) in order to function. When the conventional reel is placed on the microfilm reader, a dial or foot pedal on the reader is utilized to turn the film until the particular image is located. Once this is found, the reel must be rewound before it can be returned to storage.

By contrast, the imported autoload cartridge does not have to be rewound. For when the cartridge is placed on the microfilm reader and the film is driven by the dial or foot pedal through the film aperture (where it is projected on the screen), it is rewound from one core to the second core within the confines of the flanges. After the specific bit of information is found, the cartridge containing the film is simply removed from the reader and stored. This feature— which eliminates the need for rewinding the film—makes the cartridge particularly attractive to users since the look-up time is reduced by about one-half vis-a-vis that required for reels which must be rewound.[2] In addition, the cartridge container provides protection against dust for the film stored therein, which function, in the case of a conventional reel, is provided by a reel can.

In this setting, plaintiff's primary contention is that though the imports are parts of projectors, as classified by the government, they fall within the specific provision for "[p]hotographic film reels and reel cans" in item 722.80 and are thus properly classifiable under that item by virtue of General Headnote 10(ij) of the tariff schedules.[3] For in plaintiff's view, the imported cartridge is simply an improved type of film reel which performs the same functions as a conventional film reel and reel can—to store and project film. Defendant, on the other hand, maintains that the imported cartridge is neither a photo-

---

[2] The imported cartridge is designed for the Bell & Howell microfilm reader but can be used on other readers that can accommodate that particular microfilm.

[3] General Headnotes and Rules of Interpretation:

10. General Interpretative Rules.

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

graphic film reel nor a reel can but a multi-functional article which combines the functions of a film reel and a reel can, together with additional features beyond those found in either a film reel or reel can, such as the elimination of the need for threading and rewinding film; the elimination of the necessity of loading and unloading film; and a reduction in look-up time. Defendant further points out that the importation also has certain physical characteristics not possessed by standard film reels and reel cans, including a difference in shape; the presence inside the cartridge of two "reels"; a frame for receiving a light-source mirror; two guide rollers; and numerical calibrations on the top surface.

First, it is evident from reviewing the lexicographic authorities that a film "reel" in its common meaning is a flanged holder on which a film is wound. See e.g., *Webster's International Dictionary* (Second Edition, Unabridged (1948)); The National Microfilm Association's *Glossary of Terms* (1962 and 1966 eds.); *The Britannica World Language Dictionary* (1963). And this is what the importation primarily is—a flanged holder on which a film is wound—encased in a plastic container. Put otherwise, the importation performs the primary function of two conventional film reels—i.e., to store and project film—and the ancillary function of protecting such film. Further, the import is used in exactly the same way as two film reels—one empty and one full—placed side by side in a reader, with the film being unwound from the one reel and wound onto the other while being projected on the reader. And since the importation consists of two reels in one container, there is no need to rewind the film, thus effecting a reduction in look-up time. These features enable the film reels to function more efficiently and simply; they do not convert the film reels into anything else.

It is quite true that the importation has certain physical characteristics not possessed by ordinary film reels. These characteristics, however, only illustrate the differences between one type of film reel and a different and improved type of film reel. Likewise, the fact that there are two reels per cartridge does not change them from film reels into anything else. If there is a joinder of any kind, it is merely a joinder of two film reels in a cartridge which enables the reels to function more efficiently and swiftly than if two individual film reels were placed side by side in the reader. We cannot agree, in short, with defendant's argument that the imported cartridge "constitutes a new article of commerce which is distinct from those articles commonly referred to as film reels or film reel cans * * *." For the fact is (as we have seen) that the cartridge is an improved and more sophisticated film reel, with the auxiliary characteristics of a reel can. And it is untenable to argue that because it possesses the auxiliary characteristics of a reel can, it is not primarily a film reel.

Nor does *Castelazo & Associates* v. *United States*, 61 Cust. 391, C.D. 3639, 294 F. Supp. 81 (1968), support defendant's position. That case involved the classification of an article which combined the functions of a shovel and a pick in a manner in which neither function was dominant. The importer claimed that the article was classifiable as a shovel. The court, however, sustained the classification as articles of base metal, not specially provided for, on the basis that it was "both a shovel and a pick, each performing independently separate and different jobs." *Id.* at 394. Here, on the other hand, the import performs the primary function of a conventional reel—to store and project film; the function of the container—to protect the film—is merely auxiliary to this primary function.

Relevant so far as our present problem is concerned is *United-Carr Fastener Corporation* v. *United States*, 56 Cust. Ct. 347, C.D. 2648 (1966), *aff'd* 54 CCPA 89, C.A.D. 913 (1967). That case involved "Tee Nuts" which consisted of a threaded barrel for receiving and holding a bolt, a flange which performed the load-bearing function of a washer and served as a base for prongs, and prongs designed to be driven into wooden members as a fastening means. The articles were classified under paragraph 330 of the Tariff Act of 1930 as "[n]uts * * * of * * * iron or steel." The importer claimed they were properly classifiable as articles of metal, not specially provided for, contending that the article was a combination one which possessed features substantially in excess of those possessed by a nut, and was thus more than a nut. The court disagreed and held that the "Tee Nut" was a species of nut and thus within the ambit of the provisions therefor on the rationale that it was a labor and timesaving device which joined objects together to replace an older, obsolete method of doing the same thing. Thus, in the court's view, the article was designed as a faster, more efficient method of joining components together. The court added that "[t]he fact that a function, previously performed by a washer, which at best is but auxiliary when associated in use with a nut, was eliminated in this evolutionary process, contributed to the improvement of, rather than a change in identity of the article as a nut * * *." 56 Cust. Ct. at 352–53. In the present case, similarly, the autoload cartridge evolved as a faster and more efficient method than conventional film reels for storing and projecting microfilm.

Likewise relevant is *New York Merchandise Co., Inc.* v. *United States*, 62 Cust. Ct. 283, C.D. 3746, 305 F. Supp. 25 (1969), *aff'd* 58 CCPA 53, C.A.D. 1004 (1970), which involved poodle dog radios that were assessed as toy figures of animate objects and were claimed by the importer to be classifiable as radios or, alternatively, as electrical articles not specially provided for. The court held that the articles were more than toy figures of animate objects, but were *not* more than radios upon various grounds, including the fact that "the real benefits to be

obtained from the use of the imported poodle dog radios are the same as those which are obtained from any other radio." 62 Cust. Ct. at 289. Here, too, the real benefits to be obtained from the imported autoload cartridge are essentially the same as those obtained by two film reels and a reel can. The point is that articles are classified on the basis of their primary design, construction and function even though they are capable of performing other auxiliary or incidental operations. E.g., *Schick X-Ray Co., Inc.* v. *United States*, 64 Cust. Ct. 430, C.D. 4013 (1970); *Astra Trading Corp.* v. *United States*, 56 Cust. Ct. 555, C.D. 2703 (1966). To paraphrase what we said in *Schick X-Ray*, "[h]ere * * * the imported * * * [article] does more than its fore-runners and was designed to solve certain problems or demands of the particular function it serves. But its primary function is still the same as any other * * * [film reel—to store and project microfilm]. Thus * * * the * * * [import] is not a new article of commerce but rather a more complex and improved * * * [version] than its predecessors." 64 Cust. Ct. at 436.

The further fact pointed out by defendant that the imported arti-cles are known by the trade name "autoload cartridge" does not in any way take them out of the common meaning of film reels. There has been no attempt by either side to establish a commercial designa-tion for the term "film reels." Therefore, the common meaning of the term is controlling. See *Heads & Threads, etc.* v. *United States*, 60 Cust. Ct. 308, C.D. 3374, 282 F. Supp. 484 (1968).

This brings us to defendant's alternative claim that the importa-tions are classifiable as parts of photographic film viewers under item 722.55. We need not consider whether the articles fall within this provision for even if they do, they would still be classifiable under item 722.80 as photographic film reels by virtue of General Headnote 10(ij) which (as set out previously) provides that "a provision for 'parts' of an article covers a product solely or chiefly used as a part of such article, but does prevail over a specific provision for such part."

The protest is sustained. Judgment will issue accordingly.