(C.D. 4690)

S & T Imports, Inc. *v.* United States

Court No. 72-12-02631

(Decided March 18, 1977)

*Stein and Shostak* (*S. Richard Shostak* of counsel) for the plaintiff.
*Barbara Allen Babcock,* Assistant Attorney General (*Steven P. Florsheim,* trial attorney), for the defendant.

Maletz, Judge: The importations involved in this action consist of merchandise invoiced as "Drained preserved pineapple" which was

exported from Mexico and entered at the port of Laredo, Texas in September 1971. The merchandise was classified by the government as candied, crystallized, or glace fruits under item 154.45 of the Tariff Schedules of the United States (TSUS), as modified by T.D. 68–9 and assessed duty at the rate of 10% ad valorem.[1] Plaintiff challenges this classification and claims the imported merchandise is properly classifiable as prepared or preserved pineapple under item 148.98, as modified, dutiable at the rate of 0.75¢ per pound.

The provisions of TSUS pertinent to the classification and claim are as follows:

Classified under:

Schedule 1, Part 9, Subpart D:

> Candied, crystallized, or glacé nuts, fruits, fruit peel, and other vegetable substances:
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;

154.45    Pineapples_____ 10% ad val.

Claimed under:

Schedule 1, Part 9, Subpart B:

Subpart B headnotes:

> 1. For the purposes of this part—
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
> (e) the term "prepared or preserved" covers fruit which is dried, in brine, pickled, frozen, or otherwise prepared or preserved, but does not cover fruit juices &ast; &ast; &ast; or candied, crystallized, or glacé fruits (see subpart D of this part). [Emphasis added in part.]
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
> Pineapples, fresh, or prepared or preserved:
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;

148. 98    Prepared or preserved_____ 0.75¢ per lb.

Plaintiff claims the government's classification is erroneous contending that the importations are not candied, crystallized or glace fruit within the meaning of the statute. According to the plaintiff, in its condition as imported the merchandise in issue has neither the characteristics nor the uses of candied, crystallized or glace fruit and is not recognized in the trade and commerce of the United States as candied, crystallized or glace fruit. Thus, plaintiff insists that the imported merchandise should be classified under the provision for

---

[1] An additional surcharge of 10% was assessed on the imported merchandise under item 948.00 which plaintiff has not contested.

preserved pineapple. In addition, plaintiff states that the correctness of its claim is confirmed by the alleged fact that from at least 1948 until 1971 the merchandise was uniformly classified by the government as preserved pineapple at the seven United States ports of entry at which it was entered.

In this context, the issue in the case is whether the imported merchandise was correctly classified under item 154.45 as candied, crystallized or glace pineapple or is properly classifiable under item 148.98 as prepared or preserved pineapple, as claimed by plaintiff.

In an effort to substantiate its claim, plaintiff called five witnesses [2] and introduced eight exhibits. Defendant, for its part, called two witnesses [3] and introduced seven exhibits. In addition, the parties stipulated that the total sugar solids in the subject merchandise, in its imported condition, was between 72.4% and 74.0% by weight and that the total soluble solids content of the subject merchandise, in its imported condition, was approximately 75° brix.[4]

Against this background, we consider first the manner in which the imported pineapple is processed in Mexico. Initially the pineapple is immersed in a brine which contains sulphur dioxide as a preservative against micro-organisms and calcium carbonate to strengthen the fiber of the pineapple. The pineapple remains in the brine for periods up to a maximum of seven months while awaiting processing, during which time there is a leaching out of some of the natural sugar. When the pineapple is taken out of the brine, it is boiled to reduce the sulphur content and to tenderize the fruit so it is capable of absorbing syrup. It is then placed in a 30° brix solution (syrup) where by osmosis the liquid in the fruit comes out and is replaced by the syrup. The fruit is then subjected to further boiling and slow impregnation with syrups of sugar concentrations increased by 4° brix a day during which time heat is intermittently applied. This is continued until the pineapple and surrounding syrup reach a density or equilibrium state of about 75° brix. The sugar used in the

---

[2] Plaintiff's witnesses were Edward C. Twyford, Jr., the president of S.T.I. Industries (successor to the plaintiff company) and general manager of International Fruit Products Co., a large producer of preserved pineapple in the United States; Ralph Lagueruela, the production manager of Procesadora S.A., the Mexican manufacturer of the imported pineapple; Robert I. Unger, an associate of International Fruit Products Co.; Melvin S. Gordon, the president of the Paradise Fruit Co. in Florida, a company which preserves and imports pineapple; and Harry Dennery, the marketing director of Charles Dennery Co., New Orleans, La., a company which had been supplying the baking and ice cream industries with ingredients for more than 81 years.

[3] Defendant's witnesses were Hilton D. Hotchkiss, the president and general manager of Edenfruit Products Co. which processes pineapple in the United States; and Dr. Martin W. Miller, a professor of food science and technology at the University of California at Davis.

[4] The sugar concentration of sugar-impregnated fruit is generally measured and expressed as a brix value (°brix). More accurately, the brix value is an approximation of the percentage of total soluble solids in the product. Since practically all of the soluble solids in a sugar-impregnated fruit are sugars, the brix value, i.e., the percentage of total soluble solids, and the percentage of total sugar solids for a given product are considered roughly equal in commerce.

syrup is an invert sugar which is used to prevent recrystallization.[5] Citric acid is added to retard spoilage, while sodium benzoate is added as a preservative. Thus, after processing, the imported merchandise contains fruit, water, sugar, citric acid, sodium benzoate and in some cases food coloring. The processed pineapple is then packed in drums and shipped, or drained of excess syrups and packaged in boxes for shipment.

The record shows that candied fruit (including pineapple) is fruit which has been manufactured through the slow-impregnation or candying process, described above, and which has a sufficient sugar concentration to prevent spoilage.[6] Glace (or glazed) fruit (including pineapple) is candied fruit which has been subjected to an additional manufacturing process whereby a thin sugar glaze is applied to the surface of the fruit.[7] Crystallized fruit (including pineapple) is candied fruit which has been subjected to additional manufacturing process whereby a crystalline sugar coating is applied to the surface of the fruit.

Plaintiff's witnesses testified that "candied pineapple" has a 78° to 82° brix value which, they stated, is the minimum sugar concentration necessary to prevent spoilage. Other testimony on behalf of plaintiff indicated that for the past 25 years merchandise such as the importations has been commercially known, bought, and sold only as drained, preserved pineapple, and is not bought or sold in the trade and commerce of the United States as candied pineapple. According to the witnesses for plaintiff, the imported pineapple did not meet the specifications for candied pineapple, nor was it used for the same purposes as candied fruit. Continuing, plaintiff's witnesses testified that the imports were primarily used in making fruit cake and for this purpose were sold directly to bakers and also repackaged for retail sale to housewives; they added that another use of the imported product was for further manufacture into candied, glace or crystallized pineapple. They stated that by contrast candied pineapple was sold to confectionery manufacturers such as Whitman's, Schrafft's and Russell Stover.

Defendant's witnesses testified, on the other hand, that the importations were candied pineapple because they were made by the slow-impregnation or "candying" process and the sugar solids content of 72.4% to 74.0% and the approximate 75° brix value would preserve the imported product against spoilage under proper storage and handling conditions. However, they stated that because companies cannot

---

[5] After sucrose or cane sugar reaches a 67° brix, it is no longer stable and it is necessary to add either glucose or an invert consisting of dextrose and levulose (sugars) in order to prevent the recrystallization of the sugar. These invert sugars have the ability to mix with the sucrose and to have a solubility that will reach 77% or 78% without recrystallization.

[6] See Cruess, *Commercial Fruit and Vegetable Products* (4th ed. 1958) p. 480.

[7] *Id.* at 480–481.

insure adequate storage and handling once the product is shipped, it is an industry-wide practice to add a preservative such as benzoate of soda.[8]

Defendant's witnesses further testified that it was a general industry practice to call products such as the importations preserved or drained pineapple. In this connection, they left no doubt that the importations were preserved and drained; however, they insisted that the term drained referred to a species of a broader category of pineapple which was candied pineapple. The term candied, they testified, like the term glace, was used as a generic term in the industry to refer to fruit prepared by a slow-impregnation process where the general result was a product with the general appearance of the fruit but the tissues of which were fully impregnated with sugar to a specified level.[9]

With these facts in mind, we turn now to the legal aspects. Tariff laws are written in the language of commerce and the commercial meaning of a term is presumed to be the same as its common meaning in the absence of a contrary legislative intent or proof of a commercial designation that differs from the ordinary understanding of the term. See Sturm, *A Manual of Customs Law* (1974) pp. 202 et seq. In determining the common meaning of a term, the court may rely on its own understanding of the terminology, works of standard lexicographers, scientific authorities, the testimony of witnesses, or such other sources as may be available. E.g., *United States* v. *National Carloading Corp. et al.*, 48 CCPA 70, 71–72, C.A.D. 767 (1961); *United States* v. *John B. Stetson Co.*, 21 CCPA 3, 9, T.D. 46319 (1933).

The controversy before us involves the meaning of the term "candied" as used in the provision of the tariff schedules under consideration. In essence, plaintiff argues that the term "candied pineapple" in the trade and commerce of the United States covers only products having at least 78° to 80° brix which are primarily used by candymakers and confectioners. Defendant, on the other hand, contends that the imported merchandise is "candied pineapple" since it was manufactured by the slow-impregnation or "candying" process and since the sugar concentration is sufficient to prevent spoilage.

In resolving this controversy, we are reminded that the master rule of construction of tariff acts, as of other statutes, is to interpret them so as to carry out the legislative intent. See Sturm, *op. cit.*, *supra*, p. 156. In other words, the basic rule of construction of a statute is that the intent of Congress is to be given effect and all other rules of construction must yield if the legislative intent is shown

[8] Edenfruit Products Co. has sold, without adding a preservative, candied pineapple which had a brix value of 75° plus or minus 1.

[9] To similar effect, plaintiff's own witnesses Twyford and Dennery testified that in the industry merchandise such as the importations is in the generic sense generally referred to as "glace pineapple."

to be counter to this intent. *American Rusch Corp.* v. *United States*, 74 Cust. Ct. 153, 159, C.D. 4599, 394 F. Supp. 1402, 1405 (1975).

Highly relevant in determining what Congress intended by the use of the term "candied" is the United States Tariff Commission's *Report to the President, Candied, Crystallized or Glacé Fruits*, Report No. 74, Second Series, 1934, in which the following appeared at p. 3:

*Description and uses*

Candied, crystallized, or glacé fruits are manufactured from practically all fruits. The principal varieties are cherries, pineapples, apricots, figs, dates, pears, peaches, plums, prunelles, and green gages. Candied or glacé fruits may be generally described as confections and are used mainly as confectionery. They also have some use in cakes and ice creams.

The processes of manufacturing are much the same in the United States and other countries. The raw fruit is usually sulphured to bleach its color, and in the case of fruits such as cherries and apricots the pits are removed. The fruits are then *placed in brine to remove as much of the natural sugars as possible;* thereafter they are thoroughly washed to remove the brine solution and the excess of the sulphur dioxide present. They are then placed in sirups of increasing density with intermittent cookings. The siruping process is time-consuming as for many fruits 10 or 12 different operations are necessary before the highest density of sirup is employed. *The object is to replace the natural juices of the fruit with a highly concentrated sirup solution usually containing about 70 percent of sugar.* It is customary to use a mixture of cane or beet sugar sirup and corn sirup or glucose. After the fruit is saturated with sugar it is allowed to drain and if desired, to crystallize. * * * [Emphasis added.]

From the foregoing it appears that candied or glacé fruits are those which have been produced by the slow-impregnation process to a point where they contain about 70% sugar solids.

To the same effect is the following language in the *Summaries of Trade and Tariff Information* (1969), Schedule 1, Vol. 8, p. 275:

*The term "candied" means a product which has been impregnated with sugar, usually to such a degree that 70 percent or more of the weight is sugar.* "Crystallized" refers to sugar crystals formed on the surface of the product resulting in a rough crystalline appearance. "Glacé" refers to a coating of sugar sirup on the surface of the product resulting in a smooth, shiny appearance. Products may be crystallized or glaced whether or not they are candied. In this summary the three forms are collectively referred to as candied. [Emphasis added.][10]

---

[10] While the 1969 *Summaries* obviously are not legislative history of the TSUS, they have been used by the courts as an aid in determining the scope of tariff provisions. E.g., *Prestigeline (Div. of Weiman Co., Inc.)* v. *United States*, 75 Cust. Ct. 139, 148, n. 5, C.D. 4618, 406 F. Supp. 532, 539 (1975). Specifically, the *Summaries* are useful as an aid in the determination of the *common meaning* of terms utilized in the TSUS. *Durst Industries, Inc.* v. *United States*, 73 Cust. Ct. 160, 165–166, C.D. 4568 (1974).

In the *Summaries of Tariff Information* (1948), Vol. 7, part 4, p. 143, there is set forth, as follows, not only the formula for candied pineapple but also the reason why the tariff rate on candied pineapple is higher than the rate on the preserved product:

### PINEAPPLE, CANDIED
### (PAR. 747)

### Comment

In the United States, candied pineapple is manufactured principally for use by bakers in fruitcake mixtures, but it is also widely used as a confection.

\*      \*      \*      \*      \*      \*      \*

As illustrated below, the tariff rate on imports of candied pineapple, and the rates on pineapple in brine (the raw material) and on refined sugar, are favorable to the production of the finished product in the United States.

In 1943, for example, the average foreign value of imports of candied pineapple was 14.6 cents per pound; of pineapple in brine, 12.7 cents; and of refined sugar, approximately 3.5 cents per pound. *To produce 100 pounds of candied pineapple requires 100 pounds of pineapple in brine and 70 pounds of refined sugar.* Computed at the average foreign unit value of each of these products as imported separately, the pineapple in 100 pounds of candied pineapple represents a value of approximately $12.70, and the sugar, $2.45. [Emphasis added.]

The calculated duty on 100 pounds of candied pineapple from Cuba in 1943 was $2.04 (14 percent of $14.60), but if the two ingredients had been imported separately the duty would have been $1.36 (100 pounds of pineapple in brine from Cuba at 0.8 cent per pound and 70 pounds of Cuban sugar at 0.795 cent per pound), or an advantage of 0.68 cent a pound. However, this advantage was probably offset to a considerable extent by factors, such as the freight on the pineapple in brine and by the higher duty paid price of the refined sugar in the United States.

Under the Geneva agreement the rates of duty on Cuban sugar and on pineapple in brine were reduced approximately by one-third but the rate on candied pineapple was bound at the existing level; consequently, the tariff advantage in favor of producing the finished article in the United States has been somewhat increased.

In addition, the following from the 1948 *Summaries, id.* at p. 145, makes it clear that the term "prepared or preserved" was not intended to cover pineapple which had been produced by the slow impregnation process but was intended to cover *canned pineapple in syrup or pineapple shipped in brine or water:*

### PINEAPPLES PREPARED OR PRESERVED, EXCEPT CANDIED, CRYSTALLIZED OR GLACE
### (PAR. 747)

\*      \*      \*      \*      \*      \*      \*

52

## Comment

The prepared or preserved pineapples covered by this summary are mostly pineapples canned in sirup (sliced, chunks, or crushed) but also small quantities in brine or water for the use of manufacturers of candied or glace pineapples.[1] * * *

---

[1] This summary does not cover candied, crystallized or glace pineapples (see separate summary (par. 747)), nor pineapple juice (see separate summary, par. 806(a)).

From all of the foregoing, we find a clear manifestation of a specific Congressional intent that pineapple such as that here in issue which is produced by the slow-impregnation process and contains over 70% sugar solids constitutes "candied" pineapple for the purposes of the tariff schedules.

In an effort to counter these clear indicia of legislative intent, plaintiff puts forth the following argument (plaintiff's brief, p. 24):

> In the *1948 Summaries of Tariff Information*, Vol. 7, Part 5 at page 143, it is indicated with reference to the candied pineapple included within Paragraph 747 of the Tariff Act of 1930 (the predecessor of Item 154.45 of the Tariff Schedules) that to make 100 pounds of candied pineapple, 100 pounds of pineapple in brine and 70 pounds of refined sugar are required. As established by plaintiff's witnesses, because of the natural sugar content of pineapple of 7% to 17%, this mixture would result in at least 77% to 79% sugar solids content (R. 91–93, 150–152). [In *Elements of Food Engineering*, (1952) by Milton E. Parker, Director and Professor, Food Engineering Illinois Institute of Technology, it is recognized that the nonpotable juice of the pineapple contains about 9% of sugar (Vol. 1 at page 224)]. Such product, unlike the merchandise at issue herein, would concededly be candied pineapple.

This contention, however, is without merit for a careful reading of the record indicates that plaintiff's witnesses did *not* testify that the formula in the 1948 *Summaries* would result in a product with a 77% to 79% sugar solids content. Thus, plaintiff's witness Twyford testified that the normal natural sugar content in the imported pineapple runs about 7% to 9% and if *"no mechanical loss were present"* the resultant pineapple would have a 77% to 79% sugar solids content. (R. 93, emphasis added.) However, Mr. Twyford further indicated that *there is mechanical loss* in the manufacture of the imported product and for that reason he *could not* determine the percentage of total sugar when using 70 pounds of sugar to 100 pounds of pineapple in brine (R. 91–93). Further, the testimony of plaintiff's witness Lagueruela was carefully limited to a situation where there was "no mechanical loss" of natural sugar (R. 150–152). He, too, could not answer as to the amount of sugar solids present in a product made by the foregoing formula (*ibid.*).

The fact is that in the processing of the imported pineapples here in issue by the slow-impregnation process there is a very substantial

mechanical loss of natural sugar. Pertinent in this regard is the Tariff Commission's 1934 *Report to the President, supra,* p. 3, which pointed out that as one of the first steps in "candying" "[t]he fruits are * * * placed in brine to remove as much of the natural sugars as possible." Plaintiff's witness also testified to the fact that there is a leaching out of the soluble natural sugars from the pineapple during its processing (R. 157).

In these circumstances, we reject the argument that the legislative history indicates that "candied fruits" require over 78° brix.

Important, too, is the additional consideration that we have failed to find any authority—nor has plaintiff brought any to our attention—which would indicate that a particular brix or solid sugar percentage is necessary for a product to be a "candied" one. To the contrary, every authoritative source that the court has found through its research defined candied fruit only in terms of *how* the product is manufactured. Thus, the *Encyclopaedia Britannica* (1970), Vol. 9, p. 551, states:

> Candied fruits are made by cooking whole fruits or fairly large pieces of fruit in sirup until the fruit is clear and plump. To avoid shrinking the fruit the sugar concentration must be increased gradually. If the fruit is put directly into a heavy sirup, the water in the fruit will be drawn out because of the difference in concentration of the solutions inside and outside the fruit and the fruit cells will collapse, shriveling and toughening the pieces. Finally, the pieces are drained from the thick sirup and dried slowly until no longer sticky.

Cruess, *Commercial Fruit and Vegetable Products, supra* (hereafter referred to as "Cruess"), has the following to say (pp. 480–481):

> The candying process consists essentially of slowly impregnating the fruit with sirup until the sugar concentration in the fruit is high enough to prevent spoiling. The process must be so conducted that the fruit does not soften and become jam or become tough and shriveled. Repeated boiling and storage in sirups of progressively increasing sugar concentration will accomplish the desired results.

> Following impregnation, the fruit is washed and dried. It may be packed and sold in this form, or it may be coated with a thin glaze of sugar and glucose sirup—*glacéd.* This is done by dipping the dried candied fruit in a sirup and again drying the surface.

In Desrosier, *The Technology of Food Preservation* (1959) (hereafter referred to as "Desrosier"), the chapter entitled *Preservation of Food as Sugar Concentrates* contains the following with respect to candied and glaced fruits (p. 290):

Candied and Glacéd Fruits

> The *candying of fruits essentially involves their slow impregnation with syrup until the sugar concentration in the tissue is*

*sufficiently high that it prevents the growth of spoilage micro-organisms.* The candying process is conducted in such a manner that the fruit does not soften and become merely jam, or becomes tough and leathery. By treating fruits with syrups with progressively increasing sugar concentrations, desired results may be obtained. The reader is referred to the publications of Cruess and coworkers for detailed information on candied fruits. Following the impregnation of the fruit with sugar, the fruit is washed and dried. The candied fruit, as it is now called, may be packaged and marketed in this condition, or the fruit may be coated with a thin glazing of sugar. In this case, candied fruits are dipped into syrup and again dried. The sugar coated candied fruit is called glacéd fruit. [Emphasis added.]

In McGraw-Hill, *Encyclopedia of Science and Technology*, Vol. 5 (1966), the following is stated (p. 409):

*Glacéd fruit.* Fruit may be preserved by allowing its slow impregnation with syrup of increasing sugar concentration, developing such osmotic pressures within the tissues that microbial attack is prevented. This candied fruit is then washed, dried, and packaged. Candied fruit may be given a dip into syrup and again dried to develop a thin glaze of sugar coating; this product is called glacéd fruit. [Norman W. Desrosier.]

From the above, it is evident, as stated previously, that candied fruit is fruit which has been manufactured through the slow-impregnation process and which has a sufficient sugar concentration to prevent spoilage.

Plaintiff's witnesses testified, however, that candied fruit does not reach the stage where the sugar solids are sufficient to prevent spoilage until the percentage of such solids reaches 78° to 82° brix (R. 94–95, 196). On the other hand, the witnesses for defendant testified that a 75° brix value would be sufficient to prevent spoilage (R. 285).[11] In face of these conflicting contentions, it is significant that the authorities are in total agreement with the witnesses for defendant. For example, Desrosier, in discussing the *Preservation of Food as Sugar Concentrates*, states (p. 282):

Concentrated but Moist

A food substrate concentrated to 65 or more per cent soluble solids which contains substantial acid may be preserved with mild heat treatments provided it is protected from air. With more than 70 per cent solids, high acid content is not required.

Desrosier also discusses various foods and fruits preserved by sugar concentrates. From this discussion, it appears that such foods and fruits with a concentration of 70% sugar solids (and in some cases less) are preserved to the point where microbial spoilage cannot occur even without hermetic sealing. See Desrosier, pp. 282–284, 292.

---

[11] In this vein, a witness testifying in *Edenfruit Products Co.* v. *United States*, 10 Cust. Ct. 134, 135, C.D. 737 (1943), which dealt with brined pineapple cores, described how these cores were *candied* by being impregnated with sugar solution to approximately 72% solid sugar.

According to Cruess, the "candying process consists essentially of slowly impregnating the fruit with sirup until the sugar concentration in the fruit is high enough to prevent spoiling" (p. 480). As a corollary, Cruess specifies the concentrations in the various methods of impregnation he describes under the slow process. Under this process, a fruit is fully impregnated when the syrup has reached about 72° Balling (p. 482).[12]

Plaintiff also contends in its brief (p. 22) that "[a]ll the methods of manufacturing candied fruit described by Cruess require drying of the processed fruit, and after drying all methods result in a product in excess of 78° Brix (R. 87, 150.)"[13] Thus, plaintiff argues that the processed fruit is not free from spoilage until after drying and, therefore, not candied until after drying. While it is true that every description of the candying process includes the steps of washing and drying, this does not lead to the conclusion that the fruit is not candied until such drying takes place. In the first place, there is no evidence which correlates the drying process to specific brix values. Furthermore, as we have seen, the record establishes that processed fruit with a 75° brix is free from microbial spoilage. As previously noted, Cruess states (p. 480) that the "candying process consists essentially of slowly impregnating the fruit with sirup until the sugar concentration in the fruit is high enough to prevent spoiling." This meaning is clear and has nothing to do with the drying of the fruit once it is candied. In fact, it has been shown by the testimony that the purpose of drying the fruit is to overcome stickiness. Cruess not only agrees but also makes clear that the candying process is completed before the drying process begins. Thus, he states (p. 466):

> *Candied Fruits.* Candied fruits are prepared by gradually concentrating fruits in sirup by repeated boilings until the fruit is heavily impregnated with sugar, *this process being followed by drying to overcome stickiness.* [Emphasis added.]

In sum, we cannot agree with plaintiff's contention that candied fruits require at least 78° to 80° brix values and that the imported pineapple is not candied.

The function or use of the importation is also relevant to the question of the common meaning of a given term. *J. E. Bernard & Co., Inc.* v. *United States,* 66 Cust. Ct. 362, C.D. 4215 (1971). Thus, the questions arise as to what the use or function of candied pineapple is, and how that use or function compares to that of the imported pineapple. While plaintiff's witnesses described the use of candied fruit as being limited to candy manufacture or use as a confectionery, the legislative history and the weight of the evidence are persuasive that candied fruit is used: (1) as an ingredient in fruitcake; (2) as a confectionery;

---

[12] Degrees brix and degrees Balling are equivalent. See R. 90-91; Cruess, p. 79.

[13] The above record citations referred to in plaintiff's brief do not support this contention.

(3) as an ingredient in candy; and (4) for further manufacture into glace or crystallized fruit. See, e.g., *Summaries of Tariff Information* (1948), *supra*, p. 143; *Summaries of Trade and Tariff Information* (1969), *supra*, pp. 275–276; *Edenfruit Products Co.* v. *United States, supra*, 10 Cust. Ct. at 135; the Military Services Specification for fruitcake ingredients, including candied pineapple (defendant's exhibit G); and A & P National Bakery Division Specifications (defendant's exhibit E). See also R. 249–250, 258–259. As we have seen, the record establishes that the importations are primarily used in baking for fruitcakes and for making higher concentrated glace and crystallized fruit. Such uses are identical to those described by the authorities for candied fruit.

Turning now to another area, the testimony of plaintiff's witnesses established that the importations were referred to as "preserved," "drained" or "drained preserved pineapple." While the terminology utilized to describe a certain product has a definite bearing on what it is, it is not the *sine qua non* for classification. *W & J Sloane, Inc.* v. *United States*, 76 Cust. Ct. 62, C.D. 4636, 408 F. Supp. 1392 (1976); *J. E. Bernard* v. *United States, supra*, 66 Cust. Ct. at 367. Thus, even if the importation was exclusively referred to as drained pineapple, it would not be removed from classification under the common meaning of the term candied pineapple.

In any event, the record demonstrates that the importations were not exclusively referred to as "drained," "preserved" or "drained preserved pineapple." In this connection, two of plaintiff's witnesses testified that merchandise materially similar to the importation is referred to as "glace pineapple." See note 9, *supra*. Further, the evidence adduced by defendant showed that in the glace fruit industry the terms "glace," "drained," "preserved" and "candied" are interchangeable when used to describe products such as the imported pineapples. See R. 250–257; defendant's exhibits E, F and G. As further indication of the interchangeability of terms, Cruess refers to glace fruit being manufactured from *candied* fruit (pp. 480–481, 484), whereas a witness for plaintiff testified that glace fruit was manufactured from *drained* fruit (R. 131–133). Similarly, in *Christo Poulos & Co., Inc., et al.* v. *United States*, 35 Cust. Ct. 69, C.D. 1724 (1955), which involved the proper classification of imported preserved cargo ginger in brine, the court referred to the product made from the imported ginger both as "candied ginger" (35 Cust. Ct. at 71, paragraph 2) and "drained ginger" (35 Cust. Ct. at 72, line 2). Additionally, it is noted that in Cruess the terminology "drained candied fruit" is used (p. 484). All this impels the conclusion that the terms "candied" and "drained" are used synonymously in segments of the industry and further that the use of the term "drained" does not preclude the merchandise from being candied or glaced pineapple.

We also find without merit plaintiff's claim that the term "candied pineapple" is a commercial designation which in the trade and commerce of the United States generally, definitely and uniformly is limited to pineapple having at least 78° to 80° brix and which is used by candymakers, confectioners and fancy fruit packers. Commercial designation refers to a situation where it is affirmatively established that a tariff term, at the time it was enacted into law, had a meaning in the trade and commerce of the United States which differed from the common meaning and which was fully and completely understood and accepted throughout the United States by *all* those dealing at wholesale in that class of goods. *United States* v. *Wells, Fargo & Co.*, 1 Ct. Cust. Appls. 158, 161–162, T.D. 31211 (1911); *Florsheim Shoe Company et al.* v. *United States*, 71 Cust. Ct. 187, 190–191, C.D. 4495 (1973).

In *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, 443, T.D. 42641 (1928), the court pointed out the limitations of the commercial designation rule, as follows:

> Commercial designation is a thing often claimed in customs litigation and rarely established. The rule of commercial designation was never intended, as has been often said, to apply to cases where some portion of the trade use a certain trade practice or nomenclature, but was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and *all* the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted. There was never any other reason for the rule. [Emphasis added.]

A recent pronouncement of the law regarding the commercial designation principle was set forth in 1973 in *Florsheim Shoe Company et al.* v. *United States, supra*, 71 Cust. Ct. at 190–191, as follows:

> Where, however, it is affirmatively established that a tariff term at the time it was enacted into law, had a meaning in the trade and commerce of the United States which differed from the common meaning and was uniform, definite and general, such meaning will be adopted, unless a contrary intention of Congress is clearly manifested. * * *
>
> * * * It is generally recognized that the principal source of evidence that the commercial meaning contended for is general, definite and uniform throughout the wholesale trade at or prior to enactment of the involved statute should come from those persons who actually deal in or are conversant with the wholesale trade in which the merchandise travels and the designation it receives therein. * * *
>
>     *        *        *        *        *        *        *
>
> * * * [A] finding of commercial designation requires that the testimony of witnesses in the trade or industry show, without substantial conflict, that at the time of enactment there was a

definite, uniform and general meaning in the trade and commerce of the United States for the tariff term in issue which differs from its common meaning, and which either embraces or, as in this case, excludes the imported merchandise.

With these considerations before us, it is significant that the legislative history, the authorities cited previously, and the testimony of defendant's witnesses make it abundantly clear that not only Congress but also some sectors of the trade understood the term "candied pineapple" to include merchandise such as the imported pineapple with a brix value of 75°. Moreover, the Military Services Specifications for fruitcake ingredients issued in June 1961 (defendant's exhibit G) covers, among other things, "candied pineapple" and requires such pineapple to contain "not less than 75 percent soluble solids" which is less than the percentage plaintiff maintains is the minimum necessary to constitute "candied pineapple." Thus, plaintiff has failed to prove that the commercial designation of the term "candied pineapple" differs from its common meaning.

Finally, plaintiff states that the correctness of its claim is confirmed by the fact that from at least 1948 until 1971 *plaintiff's* entries of imported pineapple like that in issue were entered, classified and liquidated at ports of entry all over the United States (i.e., New York, Tampa, New Orleans, Baltimore, Los Angeles, West Palm Beach, Laredo and Hidalgo) as preserved pineapple, as now claimed by plaintiff. On this basis, we assume *arguendo* that plaintiff has proven the existence of a uniform and long-standing administrative practice to classify merchandise such as that involved here as "preserved pineapple." [14] In this setting, plaintiff argues that this long-continued administrative practice of almost 23 years should not be disturbed at this late date. See *United States* v. *H. Bayersdorfer & Co.*, 16 Ct. Cust. Appls. 43, 46, T.D. 42717 (1928).

A long-established practice by the Bureau of Customs will be given weight in the interpretation of the tariff statutes. *Commonwealth Oil Refining Company, Inc.* v. *United States*, 67 Cust. Ct. 37, 49–50, C.D. 4248, 330 F. Supp. 598, 608 (1971), *aff'd*, 60 CCPA 162, C.A.D. 1105, 480 F. 2d 1352 (1973). However, as pointed out in the appellate court decision in *Commonwealth Oil*, this practice is comparable to other extrinsic aids in ascertaining legislative intent when the construction of a statutory provision is doubtful. Thus, the appellate court stated (60 CCPA at 174, 480 F. 2d at 1361):

Long-established administrative practice may bear on the construction of the tariff laws as noted by the Customs Court. See *United States* v. *Fred Whitaker Co.*, 40 CCPA 19, 29, C.A.D. 492

---

[14] Three of plaintiff's other witnesses were employed by firms that also imported like pineapple. However, the record is silent as to these other importers' experiences in importing such merchandise. Accordingly, it is questionable as to whether plaintiff has proven the existence of a uniform and consistently applied long-standing administrative practice to classify merchandise such as that at issue here as "preserved pineapple."

59

(1952); *United States* v. *Electrolux Corp.*, 46 CCPA 143, C.A.D. 718 (1959). However, this court has recognized such practice to be comparable to other extrinsic aids to ascertaining legislative intent which come into play when the construction of a statutory provision is in doubt. See *Armand Schwab & Co.* v. *United States*, 32 CCPA 129, 133, C.A.D. 296 (1945); *United States* v. *C. I. Penn*, 27 CCPA 242, 245–46, C.A.D. 93 (1940). Indeed, in *C. J. Tower & Sons* v. *United States*, 44 CCPA 41, 44, C.A.D. 634 (1957), the court expressed agreement with the proposition that an administrative practice prejudicial to the importer shown to be clearly erroneous would be reversible despite its age. * * *

The legislative history previously cited shows a clear Congressional intent for merchandise such as the importations to be classified as candied pineapple. A long-established administrative practice—while carrying weight when the meaning of a statute is doubtful—cannot be persuasive when contrary to the statute and its legislative history or otherwise erroneous. *Pittsburgh Plate Glass Co.* v. *United States*, 2 Ct. Cust. Appls. 389, 391, T.D. 32162 (1912); *United States* v. *Jules Raunheim (Inc.) et al.*, 17 Ct. Cust. Appls. 425, 431, T.D. 43867 (1930); *United States* v. *International Forwarding Co. et al.*, 18 CCPA 60, 67, T.D. 44028 (1930); *White Lamb Finlay, Inc.* v. *United States*, 29 CCPA 199, 205, C.A.D. 192 (1942).

The legislative history of item 154.45, as discussed above, is compelling in requiring classification of the importations as candied pineapple. Hence, it is concluded that the government's classification of the imported pineapple under item 154.45 is correct. Plaintiff's claim is therefore overruled and judgment will be entered accordingly.